Sigurd RUTTER, Appellant,

v.

STATE of Alaska, Alaska Commercial Fisheries Entry Commission, John Williams, Burke Riley, and Robert Simon, Commissioners of the Alaska Commercial Fisheries Entry Commission, Appellees.

No. 6146.

Supreme Court of Alaska.

Aug. 26, 1983.

Pamela Finley, Robertson, Monagle, Eastaugh & Bradley, Juneau, for appellant.

John B. Gaguine and Deborah Vogt, Asst. Attys. Gen., Juneau, and Wilson L. Condon, Atty. Gen., Juneau, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

### OPINION

BURKE, Chief Justice.

This case involves a pure question of law. Plaintiff/Appellant Sigurd Rutter, a professional salmon hand troller, is challenging a series of regulations promulgated by the Commercial Fisheries Entry Commission limiting entry into the salmon hand troll fishery.[1] Rutter raises three distinct issues on appeal: (1) whether the Commission violated the provisions of the Limited Entry Act in issuing too many entry permits; (2) whether the priority classification system devised to allocate entry permits violates various Alaska statutes and the state and federal constitutions; and (3) whether the classification scheme must include the four indicia of economic dependence enumerated in AS 16.43.250(a)(1).

The superior court thought the regulations valid and dismissed Rutter's action on the Commission's motion for summary dismissal. We reverse, holding that the Commission was not free to disregard the four indicia of economic dependence set forth in AS 16.43.250(a)(1).

### I

#### The Salmon Hand Troll Fishery

There are two different salmon troll fisheries. The power troll fishery consists of larger boats equipped with cold storage fa-cilities and mechanically operated gurdies. In contrast, the hand troll fishery consists of smaller boats which usually make day trips, and are equipped with hand operated gurdies or rod and reel gear. The two compete for king and coho salmon.

Unlike the power troll fishery, which was limited in 1975,[2] the hand troll fishery remained open to entry until the Commission promulgated the regulations at issue here. As one of the few remaining open fisheries, and one requiring little in the way of initial investment, the number of commercial license holders using the hand troll fishery expanded greatly: from 1094 in 1975, to 1239 in 1976, 1849 in 1977, and 2604 in 1978. CFEC Briefing Paper No. 4, at 3, December 20, 1978.

Much of this growth is attributable to the emergence of a pleasure boat fleet. Manned by city dwellers engaged in non-fishing related occupations, these boats are primarily used for recreational and sport fishing, landing only a few salmon to defray expenses.[3] By 1978, three competing groups used the hand troll fishery: (1) the avocational sport fishermen; (2) fishermen supplementing other fishing income with income from salmon trolling; and (3) those fishermen deriving their principal livelihood from the fishery, the economically dependent trollers.[4]

As the number of fishermen increased, the area fished expanded greatly. Traditionally, hand trollers restricted activities to small areas localized around their communities. Recently, however, the highly mobile sport fishing boats have moved farther afield and are competing directly with the power trollers. Changes in the distribution

---

1. Our decision in this case was deferred pending our determination of the constitutional issues raised in State v. Ostrosky, 667 P.2d 1184 (Alaska 1983).

2. Over 30 salmon fisheries were limited almost immediately after passage of the Limited Entry Act. See 20 AAC 05.300–.320 (Eff. 12/18/74).

3. In addition, holding a commercial license enables sport fishermen to continue fishing after sport fishing bag limits are reached and lets them avoid paying a portion of the motor fuel tax. The Commission notes further that some recreational fishermen were motivated by tax considerations, fishing commercially on a small scale to generate tax deductions.

4. The Commission estimates that pleasure boats used by avocational fishermen presently constitute the largest segment of the hand troll fleet. It appears that no more than ten percent of the licensed trollers can be considered economically dependent. CFEC Briefing Paper No. 4, at 1–3, December 20, 1978.

of the catch reflect this development: hand trollers caught seventeen percent of the total troll catch in 1975 and 1976, twenty-nine percent in 1977 and thirty-four percent in 1978.[5]

Increased use led to gear restrictions and management closures in both troll fisheries. These restrictions impeded the ability of the economically dependent fishermen to earn an adequate income, prompting a limited entry proposal. Originally, the Commission contemplated issuing 1,100 permits, despite the fact that they knew the optimum number to be nearer 500–600 permits. After encountering public opposition to the 1,100 figure as being too low, the Commission decided to issue 2,150 permits.

Having set the maximum number, the Commission promulgated regulations allocating these entry permits among the over 4,000 potential applicants.[6] As required by statute, the classification system selected focuses on the degree of hardship an applicant would experience if excluded from the fishery, hardship being assessed through two hardship standards: economic dependence and past participation.

Applicants can be awarded up to thirty-one points for past participation in the fishery. 20 AAC 05.677(a)(1) (Eff. 3/6/81). An additional twenty-five points can be awarded on the basis of consistent past participation, allocated according to the number of weeks fished in any three of the five years between 1975 and 1979. 20 AAC 05.-677(b)(1).

A total of nineteen points hinges on income dependence on the fishery. Earnings from the fishery are used to assess economic dependence, as demonstrated by the table below:

| Year | Income From Fishery | Points |
|------|---------------------|--------|
| 1975 | $ 200.00 | 6 |
| 1976 | 500.00 | 6 |
| 1977 | 700.00 | 7 |
| 1978 | 750.00 | 7 |
| 1979 | 1,200.00 | 7 |

20 AAC 05.677(c)(1).

Finally, fifteen points are allocated according to the availability of alternative occupations in the place of the applicant's domicile. 20 AAC 05.677(c)(2). Applicants residing in rural areas receive the maximum number of points. *Id.*

An applicant amassing eighty or more points is considered significantly dependent and automatically qualifies for an entry permit. 20 AAC 05.678(a) (Eff. 3/6/81). Those applicants earning less than seventy points are considered less dependent and receive permits only as they become available. 20 AAC 05.678(b). Permits issued to significantly dependent applicants are freely transferrable; those issued to less dependent applicants are subject to restrictions on transfer and the buy-back provisions of the Limited Entry Act. 20 AAC 05.678(a) & (b). The Commission has yet to establish a buy-back program for the salmon hand troll fishery.

Under these provisions, Rutter could amass a total of thirty-four points.[7] He began fishing in 1979, invested in a vessel and gear, and derives approximately sixty to seventy percent of his income from hand trolling.

Under the impression that he would be denied a permit, Rutter filed suit to declare the regulations invalid. The lower court upheld the regulations, and dismissed Rutter's case on the Commission's motion for a summary dismissal. Rutter thereupon appealed to this court.

---

**5.** *Id.* at 4. The shift in catch distribution is even more pronounced in the Icy Straits area: in 1975, 75 percent of the troll catch went to power trollers, while only 25 percent went to hand trollers. By 1978, hand trollers were taking 65 percent of the catch while only 35 percent went to power trollers.

**6.** A total of 4,476 different individuals participated in the fishery from 1975 through 1979. These individuals constitute the pool of potential applicants.

**7.** Rutter qualifies for 11 points for past participation, nine for consistent past participation, seven for economic dependence, and seven for living in Sitka for a total of 34 points.

On appeal, Rutter alleges various grounds for reversal. We hold that the Commission exceeded the scope of its authority in promulgating regulations which omit three of the four statutorily mandated criteria of economic dependence.

As a threshold matter, we must determine if Rutter has standing to prosecute this appeal. The application period for obtaining a salmon hand troll permit closed on August 31, 1981. As of that date, the Commission had received 2,274 timely applications. According to the Commission, it therefore appears "nearly certain" that Rutter will obtain an entry permit. The Commission concludes that the entire case is necessarily moot.

We disagree. AS 44.62.300 provides that an "interested person" has standing to obtain judicial review of an administrative regulation. In this case, Rutter is "interested" in the number of permits issued, for his ability to fish commercially is directly affected by the number of trollers using the fishery. The parties agree that issuing 2,150 permits will necessarily result in gear restrictions and management closures, rendering Rutter's trade less profitable. That Rutter will obtain a permit does not alleviate his concern, for he is concerned that too many *other* applicants will also obtain permits.

We note further that, even if this case were technically moot, it would fall within the public interest exception to the mootness doctrine. This court will hear a moot case if it presents an issue of public importance. *Alaska Transportation Commission v. Gandia,* 602 P.2d 402, 403 (Alaska 1979); *Doe v. State,* 487 P.2d 47, 53 (Alaska 1971). In this instance, a determination here would aid the Commission in formulating new regulations and applying the old. *See Northwest Trollers Association v. Moos,* 89 Wash.2d 1, 568 P.2d 793 (1977). Moreover, a fair number of nonparties are interested in the outcome of this suit, specifically, those applicants who will not receive permits. Since the mootness doctrine is a matter of judicial discretion, and not constitutional law, we are free to elect to address the case on the merits. *See Alaska Transportation Commission v. Gandia,* 602 P.2d 402 (Alaska 1979); *R.L.R. v. State,* 487 P.2d 27 (Alaska 1971). This we proceed to do.

II

*The Maximum Number of Permits*

AS 16.43.240 sets forth the standards for determining the maximum number of entry permits the Commission can issue for a given fishery. In a distressed fishery, that is, a fishery in which the number of users exceeded the optimum number as of January 1, 1973, the maximum number "shall be the highest units of gear fished in that fishery during any one of the four years preceding January 1, 1973." AS 16.43.240(a). The act provides no guidelines for determining the appropriate number of permits for a non-distressed fishery, other than noting that the number selected should further the legislative purpose. AS 16.43.240(b).

As the salmon hand troll fishery was not overgeared as of January 1, 1973, AS 16.43.-240(b) applies and the Commission is given broad discretion in setting the maximum number. The Commission contends that the number selected is reasonable and non-arbitrary, one well within its discretion to select. Under the applicable standard of review, Rutter must establish that the number was the expression of a whim, rather than the product of reason. *Kelly v. Zamarello,* 486 P.2d 906, 910 (Alaska 1971). We conclude that Rutter has not so established.

Rutter's argument reduces to the simple proposition that the Limited Entry Act calls for the immediate exclusion of a large number of avocational fishermen so that a smaller number of economically dependent trollers can fish without any gear restrictions whatsoever. Underlying this argument is the premise that the salmon hand troll fishery is a commercial fishery, and that the interests of commercial trollers take precedence over the interests of all other users. This position, however, characterizes the purposes of the Limited Entry

Act too narrowly and ignores pertinent legislative history accompanying that act.

As initially proposed, the Limited Entry Act called for an immediate reduction in the number of fishermen to the optimum level in all distressed fisheries. Not surprisingly, this aspect of the act generated substantial public opposition. As a result, the act as passed requires that the Commission fix the maximum number of permits at a level approximating past participation, contemplating a gradual decrease in use through operation of a buy-back program. *See* 1973 House Journal 503 ("instead of making an initial reduction to the optimum number of units of gear, the commission would issue entry permits at the present level of fishing effort and reduce the amount of gear to optimum levels through a voluntary buy-back program.")

That the legislature intended the number of permits initially issued to reflect actual use is further evidenced by the very structure of the buy-back program. That program operates to purchase entry permits initially issued to less dependent trollers, individuals who would, by definition, suffer only minor economic discomfort if excluded from the fishery. *See* AS 16.43.170(c). The Act thus contemplates the issuance of permits to less dependent trollers, even though excluding these individuals would benefit the dependent trollers. Hence, the Act's purposes are not merely economic. The Act was designed to protect the reliance interests of all individuals using the fishery, as well as aiding the dependent fishermen.[8]

■ In this instance, the number of permits issued reflects present use. We therefore have little difficulty concluding that setting the maximum number at 2,150 was reasonable and in accord with the letter and spirit of the Limited Entry Act.

## III

### *The Priority Classification System*

AS 16.43.250 requires that the Commission allocate entry permits on the basis of the hardship an applicant would suffer if excluded from the fishery. Hardship is assessed through a reasonable balance of two hardship standards: economic dependence and past participation. Rutter maintains that the regulations fail to assess adequately economic dependence and past participation, and that the balance between the two is unreasonable.

### A. *Past Participation Points*

Under the present system, thirty-one points can be obtained by landing at least one fish a year for any three of the five years between 1975 and 1979. 20 AAC 05.-677(a)(1) & (2) (Eff. 3/6/81). An additional twenty-five points will be awarded on the basis of consistent past participation, assessed by looking at the number of weeks in which landings were made for any three years between 1975 and 1979. 20 AAC 05.-677(b)(1).

Rutter contends that these provisions reward the enthusiastic avocational fishermen by failing to distinguish between the economically dependent and sport-commercial trollers. The Commission responds by noting that the computer print-out on run 27(b), the system eventually adopted, shows that only twenty-eight percent of the 4476 potential applicants, or 1274 individuals, would be able to show participation in three years. Forty-seven percent participated only one year. From these figures, the Commission argues that very few "recreational dabblers" will score highly, while virtually every professional who has been active for the last several years will receive the maximum number of points.

Similarly, the Commission contends that the three to five weeks fished per year figure used to assess consistent past participation will include most professional trollers. A computer run reveals that if the number of weeks fished per year requirement were increased to seven weeks, a fig-

---

**8.** Indeed, in *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1265 (Alaska 1980), we noted that the act had the following four broad purposes: (1) enhancing the economic benefit to professional fishermen; (2) conserving the fishery; (3) avoiding unjust discrimination in the allocation of entry permits; and (4) administrative convenience.

ure *lower* than that urged by plaintiff, fully seventy-three percent of the potential applicants would receive no points. In contrast, under the present system forty-two percent participated only one year, while fourteen percent qualified for three.

■ We find these arguments persuasive. When considered in conjunction with the points awarded for economic dependence, most professional trollers will receive permits. Only in the rare instance, (*e.g.*, a professional who recently started fishing) will a "dabbler" be preferred over an economically dependent troller.[9] The act calls for no more.

When properly analyzed, Rutter's objection to the treatment of participation points is in reality an objection to the maximum number of permits issued. Rutter argues that the present system fails to distinguish between the avocational and professional troller. This is quite true, but what Rutter fails to realize is that there is *no need* to distinguish between the two groups. Given the number of permits issued, and the relatively small number of professional trollers, almost all professionals will receive permits; the exclusionary line will be drawn between serious avocational trollers and less serious avocational trollers. Rutter's objection is not that professionals will be excluded, but that too many avocational fishermen will be included. He objects to the maximum number, an objection which lacks merit.

## B. *Economic Dependence*

Earnings from the salmon hand troll fishery are used to assess income dependence. The maximum of nineteen points can be obtained by anyone deriving a relatively low gross income from the fishery: $200 in 1975, $500 in 1976, $700 in 1977, $750 in 1978, and $1,200 in 1979. 20 AAC 05.-677(c)(1) (Eff. 3/6/81). Rutter argues that "because these points do not distinguish between the economically dependent hand

troller and the weekend avocational fishermen, they are essentially meaningless."

An additional fifteen points are allocated on the availability of alternative occupations, based on the population of the place of the applicant's domicile. 20 AAC 05.-677(c)(2). Applicants living in rural areas receive the maximum number, the theory being that most avocational fishermen reside in urban areas while dependent trollers are country dwellers. Rutter, who lives in Sitka, does not address this aspect of the allocation scheme.

The crux of Rutter's argument is that the point system is over-inclusive:

If one is attempting to identify the economically dependent hand troller, and believes that only a small *portion of* participants generate a major portion of their income from hand trolling, one would not establish a system which gives all possible points in this category to approximately fifty percent of the people fishing in relevant years ... [I]t is obvious that a small group of dependent hand trollers will not be identified by a system giving all points to those making *less* than the average income in the fishery.

This argument misses the point. All that the act requires is that the Commission rank applicants by the hardship they would suffer if excluded from the fishery. Rutter, however, presumes that the Commission must precisely identify dependent trollers. Given the number of permits available, this degree of exactitude is uncalled for. Once again, plaintiff complains of the maximum number.

## C. *Reasonable Balance*

Under the present system, individuals who participate but are not economically dependent will receive a maximum of fifty-six points. An economically dependent troller who has been active for at least three

---

**9.** It is entirely consonant with the purposes of the act to give preference to those individuals that have fished the most. *Isakson v. Rickey*, 550 P.2d 359, 364 (Alaska 1976). That Rutter, as a new but dependent troller, may be passed over in favor of an established avocational fisherman is perhaps a defect in the classification

system, but it is important to remember that courts do not expect perfection of such a system. Were it otherwise, very few statutory classification schemes would survive judicial scrutiny. *See Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1267 n. 50 (Alaska 1980).

years will receive both dependence and participation points, there being no such thing as a dependent troller who did not participate. The two criteria complement each other well, and the balance is not so clearly unreasonable as to require invalidation of the regulations on this point.

## IV

*The Requirements of AS 16.43.250(a)(1)*

AS 16.43.250(a)(1) requires that the Commission include certain factors in its assessment of economic dependence. Specifically, it requires that the regulations assess "percentage of income derived from the fishery, reliance on alternative occupations, availability of alternative occupations, [and] investment in vessels and gear ...." The regulations at issue here, however, incorporate only one of these factors, availability of alternate occupations. Rutter argues that the Commission exceeded the scope of its authority in omitting these criteria, and that the regulations are consequently invalid.

The Commission found that special circumstances exist for the salmon hand troll fishery:

> [T]he standards set out in AS 16.43.-250(a)(1) for vessel ownership, percentage of income and reliance on alternative occupations do not adequately reflect the degree of economic dependence on the fishery, and are unsatisfactory for determination of the degree of hardship an applicant would suffer by exclusion from the fishery.

The Commission deemed investment in the fishery inappropriate as an indicator of economic dependence because of the "unique nature of the hand troll fishery and the management philosophy applied to it." *Findings of the Commercial Fisheries Entry Commission Regarding the Priority Classification System for the Statewide Salmon Hand Troll Fishery,* at 2, January 9, 1981. The Commission apparently reasoned that investment is unrelated to dependence, for numerous avocational trollers have invested in expensive recreational trolling boats. And reliance on alternative occupations as a ranking factor was disregarded because of the nature of that fishery as a "source of supplemental income to that derived through other means, including other fisheries." *Id.* Similarly, the "characteristically low income earned from hand trolling" persuaded the Commission to ignore the percentage of income derived by trollers from other sources. *Id.* at 3.

The Commission was not free to disregard these statutory indicia of economic dependence. It is not at all clear that the Commission could not fashion a system incorporating all four factors in a logical, reasonable manner. That the Commission feels it could design a better classification scheme using only one of the factors is beside the point; it is not free to substitute its judgment for that of the legislature. Once the legislature determined that percentage of income derived from the fishery, reliance on alternative occupations and investment were relevant to economic dependence, the Commission was deprived of the power to decide otherwise.

Administrative agencies are creatures of statute, deriving from the legislature the authority for the exercise of any power they claim. *McDaniel v. Cory,* 631 P.2d 82, 83 (Alaska 1981). In this instance, the statute requires that the Commission assess economnic dependence according to specifically enumerated factors. This the Commission failed to do. We therefore hold the regulations invalid as they relate to the assessment of economic dependence and reverse the lower court.

REVERSED.