Greg JOHNS, Leo Woods, and Mike Lynch, Appellants,

v.

COMMERCIAL FISHERIES ENTRY COMMISSION and the State of Alaska, Appellees.

No. S–2057.

Supreme Court of Alaska.

July 1, 1988.

Douglas Pope, Wagstaff, Pope, Rogers and Clocksin, Juneau, for appellants.

Margot O. Knuth, Asst. Atty. Gen., Juneau, and Grace Berg Schaible, Atty. Gen., Juneau, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

This appeal raises several challenges to the limitation of the Southeast Alaska roe herring purse seine fishery. Specifically, the appellants argue that the Commercial Fisheries Entry Commission (CFEC) made errors in establishing the maximum number of entry permits for the fishery. The appellants also claim that the hardship priority classification scheme established for the fishery failed to consider relevant factors. Finally, the appellants argue that the CFEC erred in failing to set an optimum number for the fishery.

## BACKGROUND ON THE LIMITED ENTRY ACT

In 1973, the Alaska legislature enacted the Limited Entry Act. AS 16.43.010–990. The legislature delegated implementation of the Act to the CFEC. AS 16.43.100. The Act recognized that commercial fishing had reached levels which "have impaired or threatened to impair the economic welfare of the fisheries of the state, the overall efficiency of the harvest and the sustained yield management of the fishery resource." AS 16.43.010(b). The CFEC was required to identify impaired fisheries and designate them as distressed. AS 16.43.230. In addition, the CFEC was to limit entry into those fisheries that, although not designated as distressed, had reached levels of participation which required limitation in order to achieve the purposes of the Act. AS 16.43.240.

Once the decision is reached to limit entry into a fishery, the CFEC must first establish the maximum number of permits to be issued for the fishery. For distressed fisheries, AS 16.43.240(a) provides that the maximum number "shall be the highest number of units of gear fished in that fishery during any one of the four years immediately preceding January 1, 1973." The Act does not provide guidelines for setting the maximum number for non-distressed fisheries.

Having set the maximum number, the CFEC is to "adopt regulations establishing qualifications for ranking applicants for entry according to the degree of hardship they would suffer by exclusion from the fishery." AS 16.43.250. The CFEC has adopted point systems for each of the limited fisheries for this purpose. In addition, AS 16.43.250(b) requires the CFEC to designate priority classifications of those "who would suffer significant economic hardship by exclusion from the fishery." These persons may not be denied an entry permit even if the maximum number of permits must be exceeded to accommodate them. AS 16.43.240.

Finally, the CFEC is to establish an optimum number of permits for each fishery which may be greater or less than the number of permits that have been actually issued for the fishery. AS 16.43.290. If the optimum number exceeds the issued permits, the state must issue additional permits under a method which assures the receipt of fair market value. AS 16.43.330. If the optimum number is less than the permits issued the state is to buy back the number of permits required to reach the

optimum number. AS 16.43.310–20.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In May of 1975, the CFEC received a petition from certain Southeast Alaska herring seine fishermen requesting the CFEC to limit entry into the fishery. The CFEC studied biological data on the fishery, and consulted the Alaska Department of Fish and Game. By December, 1975, a decision had been made to limit entry into the fishery. In November of 1976, the CFEC proposed regulations establishing the maximum number of permits for the Southeast roe herring purse seine fishery at thirty-five. After holding public hearings in various locations, the CFEC adopted the proposed regulations. The CFEC also adopted regulations establishing a point system for allocation of the entry permits. 20 AAC 05.662–666 (eff. 2/25/77).

The appellants are fishermen who had fished the Southeast Alaska roe herring fishery before it was limited. Each applied for permits to the fishery. Prior to final adjudication on their permit requests, appellants filed this suit seeking declaratory and injunctive relief. The superior court dismissed the action on the ground that the appellants lacked standing since they had not yet been excluded from the fishery. We reversed and remanded, holding that the appellants were interested parties for the purposes of challenging the regulations. *Johns v. Commercial Fisheries Entry Comm'n*, 699 P.2d 334 (Alaska 1985).

On remand, appellant Johns moved for a preliminary injunction requesting the court to order the CFEC to issue him an interim permit for the 1986 season. After hearing testimony, the superior court issued the injunction. The parties next made cross-motions for summary judgment. After a hearing on the motions, the superior court found that no genuine material issues of fact existed which would preclude summary judgment. The court granted summary judgment in favor of the CFEC on all issues. Johns then made a motion for another preliminary injunction ordering the CFEC to issue him an interim permit during the pendency of this appeal. The trial court granted this motion.

Appellants Woods and Lynch's applications for entry into the fishery have not been finally adjudicated but they do not expect to establish their claims for a permit. Johns' application was denied by the CFEC. That decision was affirmed by this court in a Memorandum Opinion and Judgment dated July 3, 1985 (No. 241; File No. S–606).

## DISCUSSION

### I. DID THE CFEC ACT PROPERLY IN ESTABLISHING THE MAXIMUM NUMBER OF PERMITS FOR THE FISHERY BY ADOPTING A REGULATION WITHOUT PREPARING A DECISIONAL DOCUMENT?

Alaska Statute 16.43.240(b) provides:

> When the commission finds that a fishery not designated as a distressed fishery under AS 16.43.240 has reached levels of participation which require the limitation of entry in order to achieve the purposes of this chapter, the commission shall establish the maximum number of entry permits for that fishery.

Appellants, Johns, Woods, and Lynch (hereinafter Johns) argue that the CFEC's action establishing the maximum number of permits must be vacated because the action was not accompanied by a decisional document. The trial court held that the CFEC's action in establishing the maximum number by regulation was a "quasi-legislative" action in which the commission is granted broad discretion. Such actions, the court stated, will not be disturbed if they are adopted in accord with the Administrative Procedure Act (APA), are reasonable, are within the scope of the agency's authority, and are reasonably necessary to effect the agency's purposes. Because a written decisional document is not required under the APA for "quasi-legislative" actions, the court found the CFEC's actions

---

1. The Attorney General, however, has issued an opinion indicating this portion of the Act violates the state constitutional prohibition against dedicated funds. 1985 Op. Att'y Gen. No. 2 (May 23).

were proper and granted summary judgment to the state on this issue.

We have noted that the CFEC has been given broad discretion in promulgating regulations. *See Kalmakoff v. State, Commercial Fisheries Entry Comm'n*, 693 P.2d 844, 851 (Alaska 1985). To assess the validity of an administrative regulation, we determine "whether the legislature delegated rule-making authority to the [agency], whether the [agency] followed the Administrative Procedure Act in promulgating the regulation, and whether the regulation is consistent with and reasonably necessary to implement the statutes authorizing its adoption." *Chevron U.S.A. Inc. v. Le-Resche*, 663 P.2d 923, 927 (Alaska 1983) *citing Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971). *See also Kenai Peninsula Fishermen's Co-op Ass'n v. State*, 628 P.2d 897 (Alaska 1981). In addition, we review whether the regulation is "reasonable and not arbitrary." *Kenai*, 628 P.2d at 906; *Kelly*, 486 P.2d at 911.

A. *Did the CFEC have authority to adopt regulations establishing the maximum number of permits for the fishery?*

■ Initially, we must determine if the CFEC was required by the Limited Entry Act to make a formal finding in establishing the maximum number of permits for the fishery, rather than promulgate a regulation, the procedure the commission adopted. While the CFEC admits that a finding is required on the need to limit a fishery, it argues that the statute is unclear as to the procedure to be followed in establishing the maximum number of permits. Johns, on the other hand, argues that the legislature intended the CFEC to reach a finding as to the maximum number simultaneously with its decision to limit the fishery and that therefore a decisional document as to the maximum number was required.

Our review of the legislative history cited by Johns and the statute itself does not make clear what procedure the legislature had in mind for establishing the maximum number of permits. Alaska Statute 16.43.-110 provides, however, that "the commission may adopt regulations, consistent with law, necessary or proper in the exercise of its powers or for the performance of its duties under this chapter." It was, therefore, proper for the CFEC to have used its power to adopt regulations to establish the maximum number of permits for the fishery.

B. *Is a decisional document required when the CFEC adopts regulations?*

■ To determine if a particular procedure is required when an agency promulgates a regulation, we consult the Administrative Procedure Act. *Chevron U.S.A.*, 663 P.2d at 927; AS 44.62.010 *et seq.* Johns admits that the APA does not specifically require a decisional statement when an agency promulgates a regulation, but nonetheless argues that we should impose such a rule.

We have adopted a rule that agency decisions, in exercise of their adjudicative powers, must be accompanied by written findings and a decisional document. *Phillips v. Houston Contracting, Inc.*, 732 P.2d 544, 547 (Alaska 1987); *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985); *Ship Creek Hyd. Syn. v. State Dep't of Transp. and Pub. Facilities*, 685 P.2d 715, 718 (Alaska 1984); *Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557 (Alaska 1981). We have suggested but not imposed this requirement in a non-adjudicative context. *Southeast Alaska Conservation Council, Inc. v. State*, 665 P.2d 544 (Alaska 1983) (timber sale).

Although a good case can be made for a decisional document requirement when a regulation is passed or amended,[2] the com-

---

**2.** A requirement that an agency be judged on a single, comprehensive, detailed justification for its decision, prepared at the time when it promulgates a rule, would have several potentially beneficial effects. It would force the

various subunits within the agency to pursue their differences on questions of fact, interpretation or policy until they could be resolved. It would force the agency to choose between alternative data, theories and metho-

prehensiveness and detail of the Administrative Procedure Act on this subject tends to indicate that judicial imposition of such a requirement would be counterindicated.[3] However, when an agency promulgates a regulation, the record should at least explain the reasons for the agency's action.[4] This is necessary so that we can meaningfully fulfill our statutory and constitutional review functions. Where the Administrative Procedure Act is followed, such a record is likely to exist—especially if the agency position is expressed at the hearing required under AS 44.62.210(a).

■ In this case, we find that the extensive agency record is sufficient for us to determine the basis for the CFEC's action. Because a decisional statement is not required when an agency issues a regulation, and because the record in this case adequately explains the reasons for the CFEC's actions, the trial court did not err in concluding that the CFEC had acted properly.[5]

## II. IS THE MAXIMUM NUMBER SET BY THE CFEC CONSISTENT WITH AND REASONABLY RELATED TO THE PURPOSES OF THE LIMITED ENTRY ACT?

### A. *Did the CFEC err in setting the maximum number at a level lower than the historic high for the fishery?*

■ Johns argues that even if the CFEC followed the right procedures in adopting the maximum number of permits for the fishery, the number adopted is inconsistent with and not reasonably necessary to carry out the purposes of the Limited Entry Act. Johns suggests the maximum number adopted is inconsistent with the legisla-

ture's intent to gradually limit fisheries by setting the maximum number of permits at a level approximating past participation.

The maximum number established by the CFEC for this fishery was thirty-five. 20 AAC 05.320(b)(1) (eff. 2/25/77). This number was less than the number that had participated in the fishery prior to the fishery being limited. A maximum of forty-one purse seiners participated in the fishery in the four years prior to limitation. Johns argues that if the CFEC had followed the legislature's intent, the maximum number for this fishery would have been forty-one.

In *Rutter v. State*, 668 P.2d 1343 (Alaska 1983), we had occasion to review the CFEC's action in setting the maximum number for another "non-distressed" fishery. We noted that "[t]he act provides no guidelines for determining the appropriate number of permits for a non-distressed fishery, other than noting that the number selected should further the legislative purpose." *Id.* at 1346. We held that the appellant "must establish that the number [set by the CFEC] was the expression of a whim, rather than a product of reason." *Id.*

In *Rutter*, the appellant had argued that the maximum number set by the CFEC was too high. The number set by the CFEC had reflected "present use." We concluded that the legislature intended the number of permits initially issued to reflect actual use and that therefore the number established by the CFEC was "reasonable and in accord with the letter and spirit of the Limited Entry Act." *Id.* at 1347.

We find, in this case, that the CFEC erred in establishing a maximum number which was lower than the highest number

---

dologies and create a coherent case upon which scrutiny by the courts can be focused. *Ship Creek,* 685 P.2d at 718, *citing,* Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 73 n. 3.

3. We indicated in *Ship Creek,* 685 P.2d at 719, that a detailed and comprehensive statutory scheme was a legitimate basis for not implying a decisional document requirement.

4. The same rule applies to other important non-adjudicative administrative decisions. *Moore v. State,* 553 P.2d 8 (Alaska 1976) (oil lease sale).

5. Johns also argues that the CFEC violated certain provisions of the Administrative Procedure Act (AS 44.62.010–.650) and Open Meetings Act (AS 44.62.310–312) when it established the maximum number for the fishery. Having reviewed the record, we agree with the trial court's conclusion that there were no such violations.

of units of gear fished in the four years prior to the limitation date. "[T]he legislature intended the number of permits initially issued to reflect actual use.... The Act was designed to protect the reliance interests of all individuals using the fishery as well as aiding the dependent fishermen." *Rutter*, 668 P.2d at 1347. Thus, the CFEC was obligated to select the maximum number by reference to past participation at the fishery. Had it done so, the CFEC would have selected forty-one as the maximum number.[6]

■ Although we conclude that the CFEC erred in setting a maximum number which is lower than the historic high for this fishery of forty-one, this error does not require reversal. Even though the maximum number was set at thirty-five, thus far, the CFEC has issued forty-four permits for the fishery. This is because the Act requires permits to be issued to those who would suffer significant economic hardship by exclusion from the fishery, regardless of whether the maximum number must be exceeded. AS 16.43.250(b), .270. In addition, it is possible another seven permits will be issued for the fishery to those who claim they fall into the significant hardship category. Thus, the number of permits already issued exceeds the number the CFEC should have set as a maximum.

■ Johns claims, however, that had the CFEC properly set the maximum number for the fishery at forty-one, AS 16.43.270(b) would have required the Commission to actually issue fifty-one permits. Johns' reliance on AS 16.43.270 is misplaced. The CFEC is required to define priority classifications based upon the hardship of similarly situated applicants for permits. AS 16.-43.250. The CFEC must then issue entry permits to "qualified applicants in order of descending priority classification, until the number of entry permits issued equals the maximum number...." AS 16.43.270(a). In no event, however, may a permit be denied to one who falls in a priority category which would suffer significant economic hardship by exclusion from the fishery. *Id.*

Alaska Statute 16.43.270(b) provides:

If, within the lowest priority classification of qualified applicants to which some entry permits may be issued, there are more applicants than there are entry permits to be issued, then the allocation of entry permits within that priority classification shall be by lottery. However, the commission shall issue entry permits to all qualified applicants in that priority classification if the total number of permits issued for the fishery does not exceed the maximum number of entry permits established under AS 16.43.240 for that fishery by more than five percent or 10 permits, whichever is greater.

A review of AS 16.43.270(b) indicates that it applies only where permits are available for some applicants in a particular priority classification, but issuance to all applicants in that priority classification would exceed the maximum number set for the fishery. AS 16.43.270 never applied to the fishery in question in this case. The CFEC adopted a nine point priority classification system for this fishery. 20 AAC 05.662 (eff. 2/25/77). It then determined that all applicants with six points or more would suffer significant economic hardship and pursuant to AS 16.43.270 could not be

---

6. The Limited Entry Act requires the CFEC to set the maximum number for a distressed fishery at the "highest number of units of gear fished in that fishery during any one of the four years immediately preceding January 1, 1973." AS 16.43.240(a). There are two distinctions between fisheries designated as distressed and those designated as non-distressed. First, a fishery can be designated as non-distressed and limited even though it may tolerate more units of gear than the historic high. In contrast, a distressed fishery, by definition, cannot. AS 16.43.230. Second, a distressed fishery is one which is overgeared as of January 1, 1973. A non-distressed fishery has no such time constraint.

Neither of these distinctions supports the conclusion that the legislature could have reasonably intended that the maximum number for a non-distressed fishery be lower than the historic high. We therefore find that the CFEC is obligated to set the maximum number, for a non-distressed fishery, at a level which is no lower than the highest number of units of gear fished in the four years prior to the limitation of the particular fishery.

denied a permit. 20 AAC 05.666 (eff. 2/25/77). The Commission therefore issued permits to all those who had six points or more. This resulted in the issuance of forty-four permits. As the number of permits issued already exceeded the maximum number the CFEC should have set, no permits were available for lower priority classifications and thus the provisions of AS 16.43.270(b) are inapplicable.

Since the number of permits actually issued by the CFEC exceeds the number of permits the CFEC should have set as a maximum, Johns was not prejudiced by the CFEC's failure to set the maximum number no lower than the historic high.

### B. *Is the maximum set by the CFEC in accord with the purposes of the Limited Entry Act?*

■ We now address the question of whether the maximum number set by the CFEC is in accord with the purposes of the Limited Entry Act. This point must be distinguished from the point we have discussed above that the Commission had a legal obligation to set the maximum number no lower than the historic high. We must now determine whether the CFEC's action in setting the maximum number at thirty-five is sustainable in light of the general purposes of the Limited Entry Act.

The Limited Entry Act has two purposes: enabling fishermen to receive adequate remuneration and conserving the fishery. Art. VIII, § 15 Alaska Const.; AS 16.43.-010; *Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1265 (Alaska 1980).[7] Prior to limiting this fishery, the CFEC consulted the Alaska Department of Fish and Game. The CFEC requested the Department to indicate its opinion as to the number of units of gear which could participate in the fishery from the standpoint of sound biological manage-

ment. The Department of Fish and Game responded that the maximum number should be set so that twenty-five to thirty boats could participate at any opening. The Department also indicated to the CFEC that if the maximum was set above thirty-five it would probably have to close the fishery. The Department's estimate was based upon its belief that the 1977 roe herring take would be in the 1,000 to 1,500 ton range. It noted that it had no evidence that any major increase would occur in the near future.

The CFEC had before it information indicating that the level of stocks in the fishery was low. Further, the CFEC had information from the Alaska Department of Fish and Game that they had no evidence that any major increase in the harvest would occur in the near future. Finally, the CFEC had the report of the Alaska Department of Fish and Game which indicated that it felt only twenty to thirty boats would be biologically manageable and that it would probably have to close the fishery if more than thirty-five boats participated. Under these circumstances, we cannot say that the CFEC's action in setting the maximum number at thirty-five "was an expression of whim rather than a product of reason." *Rutter*, 668 P.2d at 1346. We find that the CFEC's action was in accord with the purposes of the Limited Entry Act.

### III. WAS THE CFEC'S ACTION IN SETTING A MAXIMUM NUMBER FOR THIS FISHERY UNCONSTITUTIONAL?

■ Johns challenges the constitutionality of the CFEC's action in setting the maximum number for this fishery at thirty-five.[8] Johns argues that the CFEC's action violates the equal rights clauses of article I, section 1 [9] and article VIII, section 17,[10]

---

7. We have sometimes noted two other purposes: avoiding unjust discrimination and administrative convenience. *Apokedak*, 606 P.2d at 1265. These are objectives which should accompany a limited entry program but they are not the reasons for the program.

8. Johns also argues that the maximum number originally set by the CFEC has become unconstitutional because of changed circumstances. This issue is discussed in section V below.

9. Article I, section 1 of the Alaska Constitution provides:

because the maximum number of permits authorized does not bear a strong enough relationship to the purposes of the Limited Entry Act. In addition, Johns argues that the maximum number set by the CFEC is not consistent with the constitutionally permitted purposes of limited entry as provided in article VIII, section 15 of the Alaska Constitution.[11]

These constitutional arguments are in substance answered by part II.B. of this opinion. The CFEC's action was justified by resource conservation reasons. Imposing a limited entry system for these reasons is expressly authorized by article VIII, section 15 of the Alaska Constitution. *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983). It is a non-sequitur to contend that the exclusivity which is inherent in any limited entry system violates the state constitution, since the limited entry system is authorized under the state constitution. *Id.* at 1190.

## IV. DID THE CFEC FAIL TO CONSIDER RELEVANT FACTORS IN ESTABLISHING HARDSHIP PRIORITIES FOR THIS FISHERY?

A. *Did the CFEC have discretion to adopt priority classification regulations which did not measure all of the hardship criteria standards listed in AS 16.43.250?*

 When it adopted regulations for the fishery, the CFEC also adopted findings indicating that its point system for the fishery would not examine "consistency of participation within the fishery within a calendar year" or "income dependence." Johns argues that the CFEC lacked the discretion to disregard these factors when it established the priority classifications for the fishery.

In *Rutter*, we invalidated a regulation promulgated by the CFEC because the regulation failed to consider certain indicia of economic dependence which were described in AS 16.43.250(a)(1). *Rutter*, 668 P.2d at 1349. We determined that these indicia were mandatory rather than discretionary. *Id.*

Subsequent to our decision in *Rutter*, the legislature amended AS 16.43.250(a)(1) to clearly give the CFEC discretion as to whether to consider all of the indicia of economic dependence for a particular fishery. *See Haynes v. State, CFEC*, 746 P.2d 892 (Alaska 1987). This amendment also gave the CFEC discretion as to whether to consider both the number of years of participation in a fishery and the consistency of participation when it awards points based upon past participation under AS 16.43.250(a)(1).

In *Haynes* we stated:

In light of the legislature's rejection of the *Rutter* rule, we cannot justify applying the decision retroactively. To do so would not only require the CFEC to reopen a significant number of closed cases, but would also require it to develop a new set of regulations pursuant to an abandoned statute and to apply contradictory regulations simultaneously. The heavy burden such a rule would impose on the CFEC and the inevitable confusion it would introduce to the administrative process outweigh any bene-

This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

10. Article VIII, section 17 of the Alaska Constitution provides:

Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with

reference to the subject matter and purpose to be served by law or regulation.

11. Article VIII, section 15 of the Alaska Constitution provides:

No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

fit to be gained by a retroactive application.

*Id.* at 895. Our decision in *Haynes* applies to the case at hand, and therefore we find the CFEC had discretion to exclude considerations of income dependence and consistency of participation.

B. *Did the CFEC abuse its discretion in failing to consider income dependence and consistency in participation?*

Johns next argues that even if the CFEC had the authority not to measure each factor, it was an abuse of discretion for the CFEC not to measure consistency of participation and economic dependence in this case. In order to show that an administrative agency has abused its discretion, "it is not enough that the prescribed system ... shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse." *AT & T Co. v. United States*, 299 U.S. 232, 236–37, 57 S.Ct. 170, 172, 81 L.Ed. 142, 145 (1936) (*quoted in Kelly v. Zamarello*, 486 P.2d 906 (Alaska 1981)). To show an abuse of discretion, the appellant must show that the agency decision was an "expression of whim rather than an exercise of judgment." *Id.*

In this case the CFEC issued special findings indicating why it was not measuring consistent participation and income dependence for this fishery. The CFEC noted that the opening in this fishery may only last a few hours or minutes. It was therefore not uncommon for an operator to be unable to participate. The CFEC concluded that "consistency of participation does not truly reflect the historical participation of herring purse seine fishermen in these fisheries. Measurement of consistency of participation in a calendar year within the cited constraints is not only impractical but impossible in terms of accuracy." As to income dependence, the CFEC found "[f]ew, if any, fishermen actually depend on the herring sac roe fisheries as a reliable source of income. It is not any fisherman's primary fishery but rather a fishery of short duration prior to the salmon purse seine seasons in which he utilizes his salm-on vessel and crew with only a special net required." Under these circumstances, the CFEC found that the income dependence standard was not a valid measure of the economic dependence of a fisherman on the fishery.

Our review of the record leads to the conclusion that the CFEC's decision not to include consistency of participation and income dependence as factors in determining hardship, was not an expression of whim, but rather an exercise of judgment. As such, we find there was no abuse of discretion.

V. DID THE CFEC ERR IN FAILING TO SET AN OPTIMUM NUMBER OF PERMITS FOR THIS FISHERY WHILE PERMIT APPLICATIONS WERE PENDING?

Alaska Statute 16.43.290 provides:

*Optimum number of entry permits.* Following the issuance of entry permits under AS 16.43.270, the commission shall establish the optimum number of entry permits for each fishery....

The CFEC has not yet established an optimum number for the fishery. Johns argues that under the circumstances of this case, the CFEC was required to set an optimum number prior to a final adjudication of all permit applications. Johns suggests that the Limited Entry Act's mandate that the regulation of entry be "without unjust discrimination," AS 16.43.010(a), requires the CFEC to establish the optimum number before final adjudication of permits in cases where the optimum number will exceed the established maximum number. In addition, Johns argues that maintaining the fishery based upon the original maximum number established by the CFEC, in the face of dramatically improved conditions in the fishery, is unconstitutional.

The CFEC, on the other hand, argues that it cannot set an optimum number for the fishery until all applications are finally adjudicated. If the optimum exceeds the number of outstanding permits, the CFEC is required to sell additional permits at fair market value. AS 16.43.330. The CFEC

argues that no one who is entitled to a permit under the initial issuance guidelines of AS 16.43.270 could be required to buy a permit under the sale provisions of AS 16.43.330. Thus, the CFEC concludes that it is necessary to wait until final adjudication of initial permit applications before embarking on the optimum number process.

The trial court found that the reasonable interpretation of the phrase "following the issuance of entry permits" in AS 16.43.290 refers to "the original issuance and not the disposition of the last permit." The court nonetheless concluded that AS 16.43.290 did not provide for a more definite time frame, and that the CFEC had discretion as to whether to wait until final adjudication of all applications was complete. The court noted that, in some circumstances, it would be unreasonable for the CFEC to wait until final adjudication was complete before embarking on the optimum number process, but, under the circumstances of this case, it was reasonable.

 In *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983), we noted that there is a tension between the limited entry clause of the state constitution and the clauses of the constitution which guarantee open fisheries.[12] We suggested that to be constitutional, a limited entry system should impinge as little as possible on the open fishery clauses consistent with the constitutional purposes of limited entry, namely, prevention of economic distress to fishermen and resource conservation. *Ostrosky*, 667 P.2d at 1191. The optimum number provision of the Limited Entry Act is the mechanism by which limited entry is meant to be restricted to its constitutional purposes. Without this mechanism, limited entry has the potential to be a system which has the effect of creating an exclusive fishery to ensure the wealth of permit holders and permit values, while exceeding the constitutional purposes of limited entry. Because this risk of unconstitutionality exists, the CFEC should not delay in embarking on the optimum number process, except where there is a substantial reason for doing so.

 We find the fact that there are applications which are not finally adjudicated for the fishery does not justify the CFEC's delay in initiating the optimum number process. The CFEC should determine the optimum number for this fishery. If the optimum is greater than the number of permits issued plus the number of applications pending, the excess should be sold under the provisions of AS 16.43.330. Similarly, as to those pending applications which are finally determined adversely to the applicant, additional sales should be held.

For this reason, we REMAND this case to the superior court with instructions to order the CFEC to begin the optimum number process. In all other respects the decision of the superior court is AFFIRMED.

---

12. These are article VIII, section 3 of the Alaska Constitution which states: "Whenever occurring in the natural state, fish, wildlife, and waters are reserved to the people for common use," and the first sentence of article VIII, section 15, which states: "No exclusive right to special privilege of fishery shall be created or authorized in the natural waters of the State."