PENINSULA MARKETING ASSOCIA-
TION, Concerned Area M. Fishermen,
Aleutians East Borough, Shumagin
Corporation, Paul Gronholdt, Stanley
Mack and Peter Shuravloff, Appellants,

v.

STATE of Alaska, Alaska Board of Fish-
eries, Alaska Department of Fish and
Game and Don W. Collinsworth, Com-
missioner of Fish and Game, Appellees,

Yukon–Kuskokwim Fisheries Task Force,
Curtis Augline, Antone K. Anvil, James
Leopold, Jr., and Arthur T. Nelson, on
behalf of themselves and other persons
similarly situated, Intervenors–Appel-
lees.

No. S–3603.

Supreme Court of Alaska.

Sept. 20, 1991.

Michael A.D. Stanley, Juneau, and Alvin
J. Ziontz and Marc D. Slonim, Ziontz,

Chestnut, Varnell, Berley & Slonim, Seattle, for appellants.

Lance B. Nelson, Asst. Atty. Gen., Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellees.

Donald Craig Mitchell, Anchorage, for intervenors-appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This case involves a challenge to a cap on the number of chum salmon (chum) to be taken in the June fishery.[1] In March of 1988, the Alaska Board of Fisheries (board) adopted a cap of 500,000 chum for the June fishery to ensure that a reasonable number of chum would reach terminal fisheries in western Alaska. The cap was codified at 5 Alaska Administrative Code (AAC) 09.365(f) (1990) and took effect on June 2, 1988.

Peninsula Marketing Association (PMA)[2] filed suit in superior court seeking an order declaring 5 AAC 09.365(f) invalid and an injunction against its enforcement. The superior court upheld the regulation, and this appeal followed.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Commercial fishing in the False Pass area dates back to the early 1900's. The fishery targets sockeye salmon, but also harvests chum. Because the fishery harvests various stocks in coastal waters before they have segregated by river-of-origin, it is labelled a "mixed-stock" or "interception" fishery. Based on tagging studies, most of the chum have been identified as being of western Alaska origin and most of the sockeye as from Bristol Bay.

The number of fish harvested in the June fishery in the first half of the century was generally larger than today. From approximately 1920 to 1950, annual harvests were between 1 and 3 million sockeye and between ½ and 1 million chum. The annual harvests dropped to about 1 million sockeye and under ½ million chum from the mid-50's to the mid-70's. Catch rates from 1975 through 1987 increased to an average of 1,220,000 sockeye and 418,000 chum. The peak sockeye catch was 3.3 million in 1980; the peak chum catch was 1.1 million in 1982.

For the past twenty years, controversy has raged between Peninsula fishers and Bristol Bay fishers. Those in Bristol Bay allege that large sockeye harvests in the False Pass area have threatened the Bristol Bay fishery. Beginning in 1975, the board adopted a quota for the sockeye harvest in the June fishery based on the projected harvest in Bristol Bay. Annual sockeye fishing was limited to 6.8 percent of the projected Bristol Bay catch in South Unimak and to 1.5 percent in the Shumagin Islands.

The board has adopted other measures over the years to regulate the June fishery sockeye harvest, including guideline harvest levels and windows. Guideline harvest levels are designed to spread the sockeye harvest throughout the month and prevent overharvesting of any one segment of the salmon runs. The month is divided into four periods (June 1–11, June 12–18, June 19–25 and June 26–30), and a limit is set for each period. Windows are times during those periods in which fishing is prohibited to allow escapement and prevent overhar-

1. The June fishery refers to the False Pass or Peninsula fishery, a commercial salmon fishery located in the vicinity of South Unimak and the Shumagin Islands in the Aleutian chain.

2. PMA is used to refer to all the appellants collectively. The Peninsula Marketing Association is a non-profit corporation whose purpose is to represent the interests of commercial fishers of the Alaska Peninsula. Members of the association include residents of Sand Point,

King Cove, Nelson Lagoon, False Pass, Homer, Kenai, Anchorage, Port Moller and Seward. Other appellants include individual commercial fishers who participate in the June fishery and other private and political organizations which represent their interests.

3. In 1990, following the superior court's decision, the board increased the chum cap from 500,000 to 600,000. 5 AAC 09.365(f) (Supp. 1991).

vesting of any particular run. Under limits imposed in 1984, but repealed in 1990, no more than 96 fishing hours per week were allowed with not more than 72 consecutive hours.

While initial regulatory efforts were directed primarily at the sockeye harvest, they affected the chum harvest as well; the area was closed to fishing when the sockeye limits were met. The board first imposed a direct cap on the chum harvest in 1986. Because of concern that the 1986 Yukon River fall chum run would not be sufficient to meet escapement goals and subsistence needs, the board required that the June fishery close upon obtaining 400,-000 chums. No chum cap was imposed in 1987. In 1988 the board adopted the 500,-000 chum cap at issue in this appeal.

On December 22, 1988, PMA filed suit in superior court challenging the validity of the cap. Among PMA's allegations were the following: that the chum cap is inconsistent with AS 16.05.251(d) & (e); [4] that the cap is unreasonable and arbitrary; and that the cap violates sections 1 and 2, article VIII of the Alaska Constitution.[5] PMA requested that the superior court declare the cap void and enjoin its enforcement.

The Yukon–Kuskokwim Fisheries Task Force (YKFTF),[6] et al., intervened. In addition to answering PMA's complaint, YKFTF filed a cross-claim against the state requesting the court to order the Alaska Department of Fish & Game to close the South Unimak and Shumagin Islands June commercial fishery.

The court granted the state's motion for summary judgment, declaring the cap valid and denying PMA's request for an injunction. The court further found that AS 16.05.251(e) did not apply to this case, reasoning that the statute was not meant to cover allocations between two commercial fisheries. The court severed PMA's claims from YKFTF's cross-claim and entered a final judgment dismissing PMA's claims.[7] PMA appeals.

## II. DISCUSSION

### A. Mootness

This appeal is technically moot. In the spring of 1990 the board raised the June

4. AS 16.05.251(d) provides:
Regulations adopted [by the Board of Fisheries] must, consistent with sustained yield and the provisions of AS 16.05.258 [relating to subsistence uses], provide a fair and reasonable opportunity for the taking of fishery resources by personal use, sport, and commercial fishermen.
AS 16.05.251(e) provides:
The Board of Fisheries shall establish criteria for the allocation of fishery resources among personal use, sport and commercial fishing. The criteria may, as appropriate to particular allocation decisions, include facts such as
(1) the history of each personal use, sport, and commercial fishery;
(2) the number of residents and nonresidents who have participated in each fishery in the past and the number of residents and nonresidents who can reasonably be expected to participate in the future;
(3) the importance of each fishery for providing residents the opportunity to obtain fish for personal and family consumption;
(4) the availability of alternative fisheries resources;
(5) the importance of each fishery to the economy of the state;
(6) the importance of each fishery to the economy of the region and local area in which the fishery is located;

(7) the importance of each fishery in providing recreational opportunities for residents and nonresidents.

5. Article VIII of the Alaska Constitution provides:
Section 1. It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.
Section 2. The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.

6. The Yukon–Kuskokwim Fisheries Task Force is an unincorporated association composed of representatives of groups that represent subsistence and commercial fishers from Yup'ik Eskimo and Athabascan Indian villages along the Yukon and Kuskokwim Rivers and along the coast of the Bering Sea between the mouths of the two rivers.

7. Apparently, YKFTF's motion for summary judgment on its cross-claim is still pending in the superior court.

fishery chum cap to 600,000 fish. In addition, the board made several other changes in the regulatory scheme imposed on the June fishery, including the elimination of windows, the amendment of guideline harvest levels, and the adoption of gear limitations. *See* 5 AAC 09.365(a), (c), (f) (Supp. 1991). Since the regulation about which PMA has complained is no longer in effect, there is no live controversy for this court to decide.

Nevertheless, there are technically moot questions which merit review under the public interest exception to the mootness doctrine.[8] The state urges that this case does not fit into that exception because the challenged regulation has been amended. However, the state mischaracterizes our clearly established test for application of the public interest exception:

> The public interest exception involves the consideration of three main factors: 1) whether the disputed issues are capable of repetition, 2) whether the mootness doctrine, if applied, may repeatedly circumvent review of the issues and, 3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine.

*Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985). In addition, the determination of whether to address an issue which is technically moot ultimately rests in the discretion of this court. *Taylor v. Gill Street Investments*, 743 P.2d 345, 347 (Alaska 1987).

We decline to address PMA's complaints about the particular regulation in this case. This was a case for injunctive and declaratory relief against a chum cap which is no longer in effect. The reasonableness and constitutionality of that cap are moot. There was no claim for damages incurred as a result of the cap, nor any other reason this court finds to evaluate

the merits of the board's allocative decision when it is no longer in force. Thus, we decline to speculate as to whether injunctive relief would be proper in a similar situation in the future.[9]

However, need for judicial construction of AS 16.05.251(e) excepts this case from the mootness doctrine. Whether section 251(e) applies to intra-commercial fishery resource allocation regulations is an issue which satisfies each of the three requirements set out in *Hayes*. The authority of the board to make allocative regulations is continually at issue. Furthermore, application of the mootness doctrine could allow this issue to repeatedly circumvent review. Given the fact that it generally takes more than a year to fully litigate a case, the board could easily evade review of one of its regulations by amending it annually. Finally, the question presented is of considerable public importance to the extent that it impacts upon the allocation of Alaska's fishery resources.

**B.   Does AS 16.05.251(e) apply to the allocation of fish between two commercial fisheries?**

Alaska Statute 16.05.251(e) requires that the board "establish criteria for the allocation of fishery resources among personal use, sport, and commercial fishing." The superior court concluded that this meant that criteria must be established for inter-group allocation (i.e. personal-sport, sport-commercial, commercial-personal), but not for intra-group allocation, such as between two or more commercial fisheries. We disagree.

Statutory interpretation begins with an examination of the language of the statute construed in light of its purpose. *J & L Diversified Enter. v. Municipality of Anchorage*, 736 P.2d 349, 351 (Alaska 1987). The state argues that the language

---

**8.** *See, e.g., Municipality of Anchorage v. Anchorage Daily News*, 794 P.2d 584, 588 (Alaska 1990); *City of Cordova v. Medicaid Rate Comm'n.*, 789 P.2d 346, 352 (Alaska 1990); *Rutter v. State*, 668 P.2d 1343, 1346 (Alaska 1983); *Kentopp v. Anchorage*, 652 P.2d 453, 457 n. 3 (Alaska 1982) (collecting cases).

**9.** Since we do not reach the issue of whether the regulation in question violated the "maximum use" and "maximum benefit" standards established in article VIII of the Alaska Constitution, we will not evaluate the merits of the trial court's conclusion that those standards are not justiciable.

of the statute supports the superior court's conclusion that section 251(e) does not apply to the allocation of fish between two commercial fisheries. According to the state, there would have been no need to include the words "among personal use, sport, and commercial fishing" if the legislature intended the criteria to apply to every allocation decision.

We are not persuaded by this reading. The phrase "among personal use, sport, and commercial fishing" does not on its face indicate any intent to exclude any subsets of the phrase, such as intra-commercial allocations. Nor are those words superfluous. The legislature specifically omitted subsistence use from the list because of the statutory priority given that use; the allocation criteria of section 251(e) would not apply to decisions involving subsistence uses.[10]

A reading of the statute in light of its purpose confirms its plain meaning. The statute was designed in part to reaffirm the regulatory authority of the board, including its authority to allocate resources among all fisheries, and to provide criteria by which those allocative decisions were to be made. The criteria listed in section 251(e) are equally applicable to intra-group resource allocation as they are to inter-group allocation. There is no basis for distinguishing allocations among commercial fisheries from allocations between different types of fisheries. Commercial fishers in Fishery A would suffer the same loss if the board reallocated certain fish resources to commercial Fishery B that they would suffer if the board reallocated

the fish to sport fishers in Fishery A. Indeed, this court has specifically rejected a distinction between commercial-sport and commercial-commercial allocations. *Meier v. State, Board of Fisheries*, 739 P.2d 172, 174 (Alaska 1987).

In addition, the trial court's interpretation is internally inconsistent. Although AS 16.05.251(d) and (e) contain the same reference to allocations between uses, the court held that section 251(d) was applicable to intra-commercial allocations, following *Meier*, but that section 251(e) was not. Such a reading does not follow accepted practices of statutory construction. Each section of a statute should be read together with every other section so as to produce a harmonious whole. *City of Anchorage v. Scavenius*, 539 P.2d 1169, 1174 (Alaska 1975).

The state contends that the statute's legislative history reveals the intent to limit its application to inter-group allocation decisions. The state cites comments of Senator Victor Fischer during debate in the Senate Resources Committee as support for its interpretation:

> SENATOR FISCHER went through the individual subsections of the amendment.... [S]ubsection (e) recognizes the three categories of personal use, sport, and commercial fishing with the board establishing criteria. The criteria in (e) don't necessarily apply to all decisions in any species of fish or fish stock in all places of Alaska but to particular kinds of allocation decisions.
>
> SENATOR FISCHER said the point in listing those criteria is that where there

---

**10.** Not all personal uses classify as subsistence uses, and some subsistence uses are not personal. Personal use requires that one use the fish oneself rather than for sale or barter. AS 16.-05.940(23). The statutes define "subsistence uses" as follows:

> The noncommercial, customary and traditional uses of wild, renewable resources by a resident domiciled in a rural area of the state for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or fami-

ly consumption; in this paragraph, "family" means persons related by blood, marriage, or adoption, and a person living in the household on a permanent basis.

AS 16.05.940(31).

In ch. 52 SLA 1986, the legislature adopted (along with the allocation criteria at issue here) a statutory preference for subsistence use, as well as separate criteria for making allocative decisions among subsistence users. AS 16.05.-258. This court recently invalidated the rural component of the definition of subsistence users; the legislature's authority to give preference to subsistence uses over other uses was not challenged. *McDowell v. State*, 785 P.2d 1, 7–9 (Alaska 1989).

are allocation decisions to be made, such criteria will be taken into account. For example, the Copper River area has been heavily used for personal use as well as commercial purposes. These are objective criteria established before the use decisions are made.

Minutes of Senate Resources Committee Meeting, February 26, 1986, at 23–24. It is the state's position that since no example of intra-group allocation was given in this excerpt from the discussion, the statute was not meant to cover such decisions.

■ We have rejected a mechanical application of the plain meaning rule in favor of a sliding scale approach toward statutory interpretation. *Alaska Pub. Employees Ass'n v. City of Fairbanks*, 753 P.2d 725, 727 (Alaska 1988). Thus the plainer the language of the statute, the more convincing any contrary legislative history must be. *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982). Here the state's proffered legislative history is not sufficiently convincing to overcome the statute's plain meaning. Senator Fischer's limited comments lend support to the state's argument only to the extent that they themselves are ambiguous. They do not resolve any ambiguity in favor of the state. Indeed, arguably Senator Fischer was making the point that each of the specific criteria listed in section 251(e) need not be used in every allocation decision, a point that was being debated at the time. We can find no support for interpreting his comments as meaning that no criteria need be established by the board for decisions allocating resources between two commercial fisheries.

A quote from the committee's section by section analysis of the bill is equally unhelpful to the state.

Subsection (e) requires the board to establish criteria for the allocation of fishery resources among the various fisheries. The criteria shall be appropriate to the particular allocation decision, which might pertain to a particular geographic area (such as a stream or watershed) or to a particular stock.

Senate Committee on Resources, Section by Section Analysis of Senate Committee Substitute for House Bill 288, March 12, 1986, at 2. We think the language "among the various fisheries" plainly includes allocation between two commercial fisheries.

■ The plain language and legislative history of the statute are enough to support our conclusion, but it is also instructive that the board itself believed that the statute applied to the chum cap decision, as is evidenced by its discussion of some of the section 251(e) criteria during its debate on the cap. While this court exercises independent judgment on issues of statutory construction, the board's interpretation is entitled to "some weight." *State, Dep't of Revenue v. Alaska Pulp America, Inc.*, 674 P.2d 268, 274 (Alaska 1983). Here, the board's belief that it was supposed to apply the section 251(e) criteria supports the conclusion that section 251(e) was meant to apply to intra-group allocations.

C. Did the board properly apply AS 16.-05.251(e) in deciding to establish a chum cap on the June Fishery?

The state contends that even if AS 16.05.251(e) applies to intra-commercial allocations, the board's action in this case did in fact comply with that statute. The state implies that the board's adoption of 5 AAC 39.205 (1990) satisfies the requirements of the statute. That regulation provides:

Before adopting regulations that allocate fish among personal use, sport, and commercial fisheries, the board will, as appropriate to particular allocation decisions, consider factors such as those set out in AS 16.05.251(e).

We have remarked that,

[t]his court has repeatedly required "that agency decisions, in exercise of their adjudicative powers, must be accompanied by written findings and a decisional document." *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1260 (Alaska 1988) (and cases cited therein). This court has strongly suggested that non-adjudicative decisions of an agency must also be supported by an

adequate decisional document. *South-east Alaska Conservation Council v. State,* 665 P.2d 544, 549 (Alaska 1983).... In order to ensure careful and reasoned administrative deliberation and to facilitate judicial review, the decisions of [the board] must be adequately documented.

*Messerli v. Dep't of Natural Resources,* 768 P.2d 1112, 1118 (Alaska 1989). No decisional document was prepared by the board when it established the chum cap. The record before us does include a transcript of extensive board hearings on the cap issue that indicates what was considered by the board in making its decision. However, because the validity of the cap is moot, we need not address whether this record would have been sufficient to sustain the cap regulation.

### III. CONCLUSION

The validity of the 500,000 chum cap is moot because it is no longer in effect. Therefore, we do not address the superior court's judgment regarding the validity of the cap. Under the public interest exception to the mootness doctrine, we REVERSE the superior court's conclusion that AS 16.05.251(e) did not apply to this case, and hold that AS 16.05.251(e) does apply to allocation of fish resources between two commercial fisheries.