Steven SIMPSON, Appellant,

v.

STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.

No. S-10948.

Supreme Court of Alaska.

Nov. 19, 2004.

---

Michael Hough, Homer, for Appellant.

John T. Baker, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

The Commercial Fisheries Entry Commission (CFEC) limited participation in the Northern Southeast Inside sablefish fishery, a non-distressed fishery, and set the maximum number of permits at seventy-three. Steven Simpson challenged this number and CFEC's decision to deny him skipper participation points for 1984. The superior court upheld CFEC's decisions, and Simpson appeals. Because CFEC followed proper procedures in establishing the number of permits and denying Simpson the disputed skipper participation points, we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

In 1985 the Alaska Commercial Fisheries Entry Commission (CFEC) limited participation in the Northern Southeast Inside sablefish (blackcod) longline fishery, because CFEC feared for the economic and environmental health of the fishery, which, it believed, was threatened by overfishing. Case law required CFEC to set the maximum number of permits at a level no lower than the highest number of units of gear in the fishery in the four years prior to the January 1, 1985 qualification date.[1] CFEC therefore

---

1. *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1261–62 (Alaska 1988) (applying

proposed limiting the number of vessels in the fishery to seventy-three, the number of vessels fishing in 1984, the season in which the participation was highest. The Commissioner of the Alaska Department of Fish and Game (ADF & G) wrote CFEC, stating that even seventy-three is "too large a number to promote effective management in that area." The commissioner recommended exploring methods "to reduce the number of permits to a lower level." He stated that "[i]t has been demonstrated that 40 to 50 vessels are capable of harvesting the quota, even during years when prices were considerably lower than they are now."

To distribute the seventy-three permits, CFEC developed a point system to determine the applicants' order of priority, based on each applicant's past participation in the fishery and economic dependence on the fishery. The past participation factor awards points for past participation as a skipper and past participation as a crewmember, and the economic dependence factor awards points for relative income dependence and for vessel investment.[2]

Simpson applied for a limited entry permit for the fishery in November 1987; he claimed sixty-five points for (1) past participation as a skipper in 1983 and 1984, (2) income dependence, and (3) vessel investment. In April 1989 CFEC informed Simpson that he had qualified for thirty-two points. This total included seventeen points for his past participation as a skipper in 1983 and fifteen points for vessel investment. CFEC awarded him no points for past participation as a skipper in 1984 or for income dependence. In October 1989 CFEC conducted a hearing at Simpson's request. At issue was whether Simpson should receive (1) an additional eighteen points for participating in 1984 as a skipper or, alternatively, an additional three points for participating that year as a crewmember, and (2) an additional fifteen points for income dependence. In June 1992 the hearing officer awarded Simpson an additional three points for participating as a crewmember in 1984 and an additional fifteen points for income dependence on the fishery. The additional eighteen points increased Simpson's original total of thirty-two to fifty, rather than the sixty-five that Simpson sought. The hearing officer concluded that Simpson did not qualify for points as a skipper in 1984 because Simpson had not owned an interim-use permit for this fishery that year, and had instead used the interim-use permit of one of his crewmembers. The hearing officer's decision was mailed to Simpson, along with a cover letter informing Simpson that he remained eligible to fish with an interim-use permit. Simpson did not challenge the hearing officer's decision.

CFEC reviewed the hearing officer's June 1992 decision on its own motion and issued a Final Commission Decision in August 1992. This August 1992 decision clarified that CFEC did not credit Simpson with any catch for either 1982, when he did not participate in the fishery, or 1984, when he did not possess an interim-use permit. CFEC mailed Simpson a copy of the decision, but it did not reach him because he had moved. Simpson did not challenge the commission's decision. The parties dispute whether Simpson's attorney received a copy of the commission's decision.

In November 1997 CFEC mailed Simpson another copy of the commission's 1992 decision. He requested a hearing in February 1998, but in October 1998 CFEC denied this request as untimely. Simpson telephoned CFEC in May 1999 to inquire about the status of his application. He was told his application would probably be denied.

CFEC determined in July 1999 that due to the number of applicants with more than fifty points, "[a]pplicants with final classifications of 50 or fewer points have no chance of receiving permits." It sent Simpson a final permit denial notice, because it was "mathematically impossible for an applicant with 50 or fewer points to qualify for a ... permit." Simpson appealed to the superior court in August 1999.

AS 16.43.240).

2. The point system for this fishery is described in 20 Alaska Administrative Code (AAC) 05.705 (2003).

In the meantime CFEC was considering the optimum level of participants in the fishery. The superior court therefore granted a limited remand so the parties could present evidence to CFEC on that topic; they did so. CFEC issued a public notice and proposal in April 2000 with a preliminary rationale for an optimum number. The superior court then accepted a stipulation to stay Simpson's appeal pending CFEC's consideration of a regulation setting seventy-three as the optimum number. CFEC adopted that number in March 2001 and issued a final rationale document discussing public comment. That document stated:

> If we were to focus purely upon the needs of Fish and Game managers to conserve the resource over all years, the optimum number would be lower than 73, probably somewhere in the 40 to 50 range. However, 73 represents a compromise between demands of conservation and recognition that 73 will likely be manageable in many years while providing sufficient opportunity for participation by fishers to avoid the fishery being considered too exclusive.

The rationale document stated that an optimum number of seventy-three "does not fully respond to the concerns of the [ADF & G]," but that it achieves "a reasonable balance of the factors to be considered in establishing an optimum number under AS 16.43.290." The regulation adopting seventy-three as the optimum number, 20 AAC 05.1145, became final in May 2001. The superior court then lifted the stay of the appeal, and briefing resumed in the superior court.

The superior court affirmed CFEC's decisions in all respects, deciding that (1) CFEC did not err in determining the optimum number to be seventy-three, and that (2) Simpson failed to exhaust his administrative remedies in his claim for past participation points as skipper in 1984 and would not qualify for a permit even if he had exhausted his adminis-

trative remedies. Simpson appeals from the superior court's decision.

## III. DISCUSSION

### A. Standard of Review

 We review here the decision of the superior court acting as an intermediate appellate court when it reviewed an administrative finding. "We independently review the merits of an administrative determination."[3] In reviewing administrative decisions, we have recognized at least four principal standards of review.[4] "These are the 'substantial evidence test' for questions of fact; the 'reasonable basis test' for questions of law involving agency expertise; the 'substitution of judgment test' for questions of law where no expertise is involved; and the 'reasonable and not arbitrary test' for review of administrative regulations."[5] We review an agency's interpretation of its own regulation under the reasonable basis standard, deferring to the agency unless the interpretation is "plainly erroneous and inconsistent with the regulation."[6] We review questions of law and issues of constitutional interpretation de novo under the substitution of judgment standard.[7]

### B. CFEC Did Not Err in Setting the Number of Permits for the Northern Southeast Inside Sablefish Longline Fishery at Seventy–Three.

CFEC has the authority to limit participation in a fishery by setting the "maximum number" of permits.[8] We stated in *Johns v. Commercial Fisheries Entry Commission* that for a non-distressed fishery CFEC is required to set the maximum level "at a level that is no lower than the highest number of units of gear fished in the four years prior to

3. *Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997).

4. *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

5. *Id.*

6. *Lauth v. State*, 12 P.3d 181, 184 (Alaska 2000) (quoting *Bd. of Trade, Inc. v. State, Dep't of Labor, Wage & Hour Admin.*, 968 P.2d 86, 89 (Alaska 1998)).

7. *Revelle v. Marston*, 898 P.2d 917, 925 n. 13 (Alaska 1995).

8. AS 16.43.240.

the limitation of the particular fishery."[9] The permits are distributed to applicants on a ranking system.[10] Following the distribution, CFEC "shall establish the optimum number of entry permits" based on statutory factors.[11] The "optimum number" can fall within a range of numbers that will result in a reasonable return to fishermen and a healthy fishery.[12] This range may increase or decrease with changes in biological or market conditions.[13]

CFEC must follow certain procedures to bring the actual number of permits, a figure based on the maximum number, into line with the optimum number.[14] Thus, if the optimum number of permits is fewer than the outstanding number of permits, CFEC may establish a buy-back program for the fishery, purchasing outstanding permits until the optimum number is reached.[15] But if the number of outstanding entry permits is fewer than the optimum number, CFEC is required to issue new entry permits until the optimum number is reached.[16]

### 1. Maximum number

■ Simpson contends that the maximum number of permits for this fishery is too low. He claims the maximum number adopted by CFEC is not reasonably necessary to (1) carry out the purposes of the Limited Entry Act[17] (Act), (2) avoid hardship to persons engaged in the fishery, and (3) meet the constitutional goals we discussed in *Johns*[18] and *State v. Ostrosky*.[19] He argues that the maximum number is inconsistent with the

Act's requirement of accomplishing the limitation without unjust discrimination.

CFEC argues that *Johns* states that (1) it must set the maximum number for a non-distressed fishery at a level no lower than the highest number of units of gear in the fishery in any one of the four years prior to the limitation of the fishery,[20] and (2) conservation concerns based on the recommendations of the ADF & G are a sound basis for determining the maximum number.[21]

The Act does not provide guidelines for setting the maximum number for non-distressed fisheries,[22] other than stating that the number should further the legislative purpose.[23] In *Johns*, a case also involving a non-distressed fishery and facts similar to those here, we stated that the legislature could not have

reasonably intended that the maximum number for a non-distressed fishery be lower than the historic high. We therefore find that CFEC is obligated to set the maximum number, for a non-distressed fishery, at a level which is no lower than the highest number of units of gear fished in the four years prior to the limitation of the particular fishery.[24]

Consequently, we stated that the number could not be lower than forty-one in the fishery at issue in *Johns*, because "[a] maximum of forty-one purse seiners participated in the fishery in the four years prior to limitation."[25] *Johns* did not state clearly that for a non-distressed fishery the number should be the highest number of units of gear

---

**9.** 758 P.2d 1256, 1262 n. 6 (Alaska 1988).

**10.** AS 16.43.250–.260; *Johns*, 758 P.2d at 1258.

**11.** AS 16.43.290.

**12.** *See* AS 16.43.990(6); AS 16.43.290.

**13.** *See* AS 16.43.300.

**14.** AS 16.43.310–.330.

**15.** AS 16.43.310.

**16.** AS 16.43.330.

**17.** AS 16.43.010.

**18.** *Johns*, 758 P.2d at 1263–64.

**19.** *State v. Ostrosky*, 667 P.2d 1184, 1190 (Alaska 1983).

**20.** *Johns*, 758 P.2d at 1262 n. 6.

**21.** *Id.* at 1263.

**22.** *Id.* at 1258.

**23.** *Rutter v. State*, 668 P.2d 1343, 1346 (Alaska 1983), *superseded by statute as stated in Haynes v. State, Commercial Fisheries Entry Comm'n*, 746 P.2d 892, 894 (Alaska 1987).

**24.** *Johns*, 758 P.2d at 1262 n. 6 (discussing AS 16.43.240).

**25.** *Id.* at 1261.

fished in that fishery in *any one of* the four previous years, as AS 16.43.240(a) requires for distressed fisheries.[26]

 We now expressly hold that for a non-distressed fishery CFEC must set the maximum number at a level that is no lower than the highest number of units of gear fished in any one year of the four years prior to the limitation of the particular fishery. Otherwise the words "highest" and "maximum" would make the sentences quoted above illogical, because totaling all the participants during the four years would produce a single number that could not have a "maximum."[27] Similarly, we required the maximum number to be no lower than the highest number historically;[28] the highest number would normally mean the highest in any season, because both "highest" and "maximum" imply a comparison between seasons. This interpretation presents the best way grammatically to read this language. The highest number, therefore, does not mean the total number of permits fished during the four qualifying years, as Simpson seems to argue. Furthermore, our quoted language in *Johns* referred to the statute applicable to a distressed fishery, AS 16.43.240(a), which states that "the maximum number of entry permits ... shall be the highest number of units of gear fished in that fishery during any one of the four years immediately preceding January 1, 1973."[29] This implied that the requirement that the "maximum number" for non-distressed fisheries was the maximum number for any one year.

 Per *Johns*, CFEC was therefore required to set the maximum number at a level no lower than the highest number of participants during any one year of the past four years. CFEC set the maximum at seventy-three, thus meeting the first part of the *Johns* requirement. *Johns* also requires CFEC to meet the Act's two legislative pur-

poses of "enabling fishermen to receive adequate remuneration and conserving the fishery."[30] In meeting these purposes, CFEC may consider evidence from other departments regarding (1) level of stocks in the fishery, (2) predictions for changes, and (3) recommendations regarding the maximum number.[31] CFEC here considered ADF & G's comments that this fishery was troubled and that even seventy-three might be an unsustainable number. CFEC accordingly struck a permissible balance between the Act's purposes of ensuring that fishermen receive adequate remuneration and conserving the fishery.

 In challenging the maximum number, an applicant must show that the number "was an expression of whim rather than a product of reason."[32] Because CFEC complied with the requirements of *Johns* by considering past participation and other related factors as explained above, its decision to set the maximum at seventy-three was not an expression of whim. We therefore uphold it.

 Simpson advances two other arguments related to the maximum number. First, he argues that according to CFEC's records, the highest number of units of gear in one of the four years before the limitation was seventy-four, not seventy-three. CFEC replies that Simpson waived his argument that seventy-four people participated in the fishery in 1984, because he did not make it in his opening superior court brief. We agree with CFEC and the superior court that Simpson waived this argument because he raised it for the first time in his superior court reply brief.[33]

Second, Simpson apparently argues that CFEC can exceed and has exceeded maximum permit levels in other fisheries without triggering the lottery provision of AS

---

**26.** *Id.* at 1262 n. 6.

**27.** This assumes that CFEC knows how many people participated in the fishery, so that "maximum" does not refer to the largest possible total number out of several possible total numbers of participants for those years.

**28.** *Johns,* 758 P.2d at 1262 n. 6.

**29.** AS 16.43.240(a).

**30.** *Johns,* 758 P.2d at 1263.

**31.** *Id.*

**32.** *Id.*

**33.** Alaska R.App. P. 212(c)(3).

16.43.270.[34] Thus, Simpson contends that CFEC was wrong to assert "that if it exceeds the maximum number of permits, [it] 'is required to conduct a lottery to reach the maximum number precisely.' " This argument misstates CFEC's position and is also irrelevant.

Contrary to Simpson's argument, CFEC does not claim that it must conduct a lottery simply because it increases the maximum number. Instead, CFEC correctly points out that it is required by law to conduct a permit lottery *under certain circumstances*.[35] Simpson also fails in his attempt to analogize this fishery to fisheries in which CFEC has issued more than the maximum number of permits. CFEC exceeded the maximum number in *Johns* because it was required to do so by law.[36] The Norton Sound herring seine fishery's original maximum number was increased to comply with *Johns* when CFEC "learned the highest number of participants in one of the four years prior to limitation was higher than CFEC's initial research revealed."[37] Neither situation applies in this case. Simpson's argument that CFEC has issued more than the maximum number of permits in other fisheries without conducting a lottery is therefore irrelevant.

## 2. Optimum number

■ Simpson contends that the 1994 adoption of the shared quota system to replace the derby system in this fishery resulted in significant advantages to the participants, the market, the public, and the environment. Each fisher under a shared quota system receives an equal share of each year's quota, whereas each fisher under a derby system tries to catch as many fish as possible during the season. Simpson contends that this quota system established an economically stable and equally lucrative fishery. He argues that the optimum number of permits should be greater than seventy-three, and contends that it should be 109.

CFEC argues that Simpson must show not merely that CFEC achieved an imperfect balance of the statutory factors it must consider in establishing the optimum number, but rather that it failed to reasonably consider the factors at all.[38] It claims he has failed

**34.** AS 16.43.270, dealing with initial issuances of entry permits, states in part:

(a) The commission shall issue entry permits, for each fishery, first to all qualified applicants in the priority classifications designated under AS 16.43.250(b) and then to qualified applicants in order of descending priority classification, until the number of entry permits issued equals the maximum number of entry permits established under AS 16.43.230 and 16.43.240 for each fishery, except that a person within a priority classification specified under AS 16.43.250(b) may not be denied an entry permit.

(b) If, within the lowest priority classification of qualified applicants to which more than one entry permits may be issued, there are more applicants than there are entry permits to be issued, then the allocation of entry permits within that priority classification shall be by lottery. However, the commission shall issue entry permits to all qualified applicants in that priority classification if the total number of permits issued for the fishery does not exceed the maximum number of entry permits established under AS 16.43.240 for that fishery by more than five percent or 10 permits, whichever is greater. The number of these entry permits is then brought into line with the optimum number in the manner described below in Part III.B.3.

**35.** The lottery provision applies when there are too many applicants within a given point level to

precisely reach the maximum number of permits and the issuance of permits to all the applicants at that point level would exceed the maximum number by more than five percent or ten permits, whichever is greater. *See* AS 16.43.270(b).

**36.** Under AS 16.43.250, "CFEC is required to define priority classifications based upon the hardship of similarly situated applicants for permits." *Johns*, 758 P.2d at 1262. It then must issue permits to "qualified applicants in order of descending priority classification, until the number of permits issued equals the maximum number...." *Id.* (quoting AS 16.43.270(a)). But a permit cannot "be denied to one who falls in a priority category which would suffer significant economic hardship by exclusion from the fishery." *Id.* (citing AS 16.43.270(a)). In *Johns*, CFEC had determined that all applicants above a certain point level would suffer significant economic hardship if excluded; therefore, CFEC was required to issue permits to all of these applicants even though it surpassed the maximum number. *Johns*, 758 P.2d at 1262–63.

**37.** *See* Norval E. Nelson, Jr., CFEC 89–308–A at 18.

**38.** *Johns*, 758 P.2d at 1265; AS 16.43.290.

to do this. CFEC maintains that it thoroughly considered data related to both the conservation and economic considerations, including information the ADF & G provided. It contends that it struck a reasonable balance of the relevant factors in accordance with the Act's purposes and it did not abuse its discretion.

■ Alaska Statute 16.43.290 requires CFEC to establish the optimum number of permits and lists the factors CFEC needs to consider in doing so. It provides:

> Following the issuance of entry permits under AS 16.43.270, [which is based on the maximum number,] the commission shall establish the optimum number of entry permits for each fishery based upon a reasonable balance of the following general standards:
>
> (1) the number of entry permits sufficient to maintain an economically healthy fishery that will result in a reasonable average rate of economic return to the fishermen participating in that fishery, considering time fished and necessary investments in vessels and gear;
>
> (2) the number of entry permits necessary to harvest the allowable commercial take of the fishery resource during all years in an orderly, efficient manner, and consistent with sound fishery management techniques;
>
> (3) the number of entry permits sufficient to avoid serious economic hardship to those currently engaged in the fishery, considering other economic opportunities reasonably available to them.[39]

The optimum number, which is codified by regulation for this fishery,[40] "may be greater or less than the number of permits that have been actually issued for the fishery." [41]

As noted above, CFEC had evidence that the stock strength of the fishery was declining, and ADF & G thought that even seventy-three permits would be too many. The fishery, as well as the fishers' livelihood, depends on a sustainable catch. Thus, CFEC wrote that it believed that "conservation of this resource is the primary consideration." Its decision to set the optimum number at seventy-three, therefore, is reasonable and not arbitrary, and is also consistent with the statute and reasonably necessary to its purposes; it consequently satisfies the standard of review we apply when reviewing an administrative regulation.[42] We therefore uphold it.

### 3. Bringing the maximum number into line with the optimum number

Simpson asserts that it was incorrect for CFEC to contend below that setting the optimum number above seventy-three would require CFEC to sell the additional permits for fair market value. He states that CFEC was asked to establish, not revise, an optimum number of permits for the fishery; he consequently argues that AS 16.43.290 does not address the sale of permits.

Simpson's briefs do not make it clear how an increase in the optimum number would benefit Simpson, i.e., make him eligible to obtain a permit without paying for it. It is the maximum number that is important in this case. Perhaps Simpson is contending that setting the optimum number at a figure larger than seventy-three somehow would have increased the maximum number enough beyond seventy-three that his point total would have made him eligible for a permit. Or perhaps he is contending that if the optimum number had been much larger than seventy-three, CFEC would not have auctioned off the additional permits, and instead would have issued him a permit without requiring him to pay fair market value for it.

■ But such contentions would be inconsistent with the controlling statute. As we stated in *Johns,* once CFEC has determined the optimum number for a fishery, "[i]f the optimum is greater than the number of permits issued plus the number of applications pending, the excess should be sold un-

---

**39.** AS 16.43.290.

**40.** 20 AAC 05.1145.

**41.** *Johns,* 758 P.2d at 1258.

**42.** *Lauth v. State,* 12 P.3d 181, 184 (Alaska 2000).

der the provisions of AS 16.43.330." [43] CFEC may sell additional permits if the "number of outstanding entry permits for a fishery is less than the optimum number." [44] Alaska Statute 16.43.330 calls for issuing the additional permits in a manner "that assure[s] the receipt of fair market value." [45] Therefore, if the optimum number exceeded the maximum number, the controlling statute would be AS 16.43.330, not AS 16.43.290, the statute Simpson cites. This means that increasing the optimum number would not help Simpson. He would have to pay fair market value for an auctioned permit; he might as well purchase a permit on the open market.

Simpson's assertion that CFEC has not auctioned permits in the past does not demonstrate any error here. CFEC's practice in other fisheries does not establish that it erred when it found that the maximum number of permits for this fishery should be seventy-three and that the optimum number was no greater than seventy-three.

### C. CFEC Did Not Violate Simpson's Constitutional Right to Equal Protection.

 Simpson argues that this fishery will exclude, in violation of article I, section 1 and article VIII, sections 3, 15, and 17 of the Alaska Constitution, fishers who have been participating in the fishery for at least twenty years.

CFEC argues that *Johns* states that (1) article VIII, section 15 of the Alaska Constitution authorizes a limited entry system,[46] and that (2) regardless of changed circumstances, the Act's optimum number provision is the mechanism by which the constitutional-

ity of the limited entry system is maintained.[47]

In *Johns* we stated that the

CFEC's action was justified by resource conservation reasons. Imposing a limited entry system for these reasons is expressly authorized by article VIII, section 15 of the Alaska Constitution. It is a non-sequitur to contend that the exclusivity which is inherent in any limited entry system violates the state constitution, since the limited entry system is authorized under the state constitution.[48]

Similarly, we stated in *Ostrosky* that article VIII, section 15 of the Alaska Constitution authorized a limited entry system despite the implicit prohibition found in article VIII, section 3 of the Alaska Constitution.[49] Simpson's constitutional argument is therefore without merit.

### D. CFEC Did Not Err in Denying Simpson Skipper Participation Points for the 1984 Season.

 Simpson argues that CFEC erred in denying him points for participating as a skipper in 1984. CFEC contends that Simpson failed to exhaust his administrative remedies and that he does not qualify as a skipper under the "plain language of the governing regulation." We need not address CFEC's first contention, because whether or not Simpson exhausted his administrative remedies, he loses on the merits.

Per 20 AAC 05.705(a)(1)(A), to receive past participation points as a skipper, one must have commercially harvested the resource "as a skipper." [50] "Skipper" is defined by 20

---

43. *Johns*, 758 P.2d at 1266.

44. AS 16.43.330; *see also Vik v. Commercial Fisheries Entry Comm'n*, 636 P.2d 597, 598 n. 3 (Alaska 1981) ("New permits may be issued when the number of outstanding permits is less than the optimum.").

45. AS 16.43.330.

46. *Johns*, 758 P.2d at 1264.

47. *Id.* at 1263 n. 8, 1266.

48. *Id.* at 1264 (citations omitted).

49. *State v. Ostrosky*, 667 P.2d 1184, 1189 (Alaska 1983); *see also id.* at 1190 ("We conclude that the purpose of the amendment to article VIII, section 15 was to grant the state the power to impose a limited entry system in any fishery, notwithstanding any state constitutional provisions otherwise prohibiting such a system."); *id.* ("The authority to impose some limited entry system became in 1972 a part of Alaska's constitution. The amendment granting that authority cannot, in turn, be challenged as unconstitutional under preexisting clauses in the same document.").

50. 20 AAC 05.705(a)(1)(A).

AAC 05.713(9) to mean "a gear operator who ... (C) was licensed according to the following: (i) for the years 1978–1984 had, at the time the skipper participation occurred, a valid sablefish interim-use permit for the fishery for which the applicant is applying."[51]

Simpson stated in his affidavit: "I completely forgot to get an inside Blackcod license in 1984 until the day before the opening. Since one of my crewmembers, Kenton B. Pierce, was in possession of a valid inside license for that year we sold the fish on his license." Pierce confirmed that he did not wish to apply for a limited entry blackcod permit and that the delivery should be credited to Simpson as the skipper. Because Simpson had on board and used a valid sablefish interim-use permit for the fishery issued to his crewmember, Simpson argues that he satisfies 20 AAC 05.713(9)(C)(i).

The plain language of 20 AAC 05.713(9)(C)(i) requires that, to be a skipper, an applicant must have had a valid interim-use permit. Simpson did not have one for 1984. Only his crewmember did. The plain language interpretation of the definition therefore supports CFEC's argument.[52] In addition, in *Crivello v. State, Commercial Fisheries Entry Commission* we upheld CFEC's decision not to permit a partner to donate his vessel and gear ownership points to the other partner.[53] We reached a similar conclusion in *Alaska Commercial Fisheries Entry Commission v. Russo*.[54]

Russo, who did not himself hold a gear license for the disputed year, sought partic-ipation points as an equal partner of a gear license holder.[55] He relied on *State, Commercial Fisheries Entry Commission v. Templeton*, in which we granted Templeton income dependence points under the "special circumstances" provision of 20 AAC 05.630(b)(2) even though Templeton lacked a gear license for those disputed years.[56] We rejected Russo's claim, stating that "*Templeton* has been limited ... to cases involving income dependence points. *Templeton* does not apply to equal protection claims or to claims for past participation points...."[57] We reasoned that "[t]here is a textual difference between the 'special circumstances' clause, ... applicable to income dependence points and the 'unavoidable circumstances' clause, ... applicable to past participation points."[58] "Unavoidable" implies a narrower set of circumstances than "special" and requires both uniqueness and unavoidability.[59] We stated that the

> CFEC's interpretation of "unavoidable circumstances," which results in limiting application of the clause to cases where fishermen are prevented from fishing by circumstances beyond their control, is supported by this distinction. While the cases of non-licensee partners may be relatively unique, thus justifying a finding of special circumstances, they were not brought about by uncontrollable external forces, thus justifying CFEC's refusal to find unavoidable circumstances.[60]

Simpson seeks past participation points, even though he admits he did not have a valid interim-use permit for 1984. Although we relied in *Russo* on the difference between

---

51. 20 AAC 05.713(9). There is no dispute Simpson satisfied 20 AAC 05.713(9)(A) and (B).

52. We apply a sliding scale approach for interpreting statutes. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1239 (Alaska 2003) (" 'The plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' ") (quoting *Municipality of Anchorage v. Suzuki*, 41 P.3d 147, 150 (Alaska 2002)); *Tesoro Petroleum Corp. v. State*, 42 P.3d 531, 537 (Alaska 2002). Simpson has not argued any legislative or regulatory intent contrary to the regulation's plain meaning.

53. *Crivello v. State, Commercial Fisheries Entry Comm'n*, 59 P.3d 741, 745–46 (Alaska 2002).

54. *Alaska Commercial Fisheries Entry Comm'n v. Russo*, 833 P.2d 7 (Alaska 1992).

55. *Id.* at 8.

56. *Id.* at 8–9 (finding trial court's reliance on *State, Commercial Fisheries Entry Comm'n v. Templeton*, 598 P.2d 77 (Alaska 1979), misplaced).

57. *Id.* at 9.

58. *Id.*

59. *Id.*

60. *Id.* at 9–10.

the "special circumstance" clause and the "unavoidable circumstance" clause, a distinction not apparent in this case, we also rejected the argument Simpson makes here: that non-licensed fishers can receive past participation points.

Simpson also argues that he is entitled to additional points because he and Pierce were joint operators. CFEC argues that Simpson is not entitled to joint operator points, because the applicant must participate as a "skipper" to be a joint operator.[61]

The joint operators regulation, 20 AAC 05.703(b)(4), states:

> After the pounds landed and annual catch value of the joint operation have been allocated among the joint operators in accordance with (1)-(3) of this subsection, skipper participation points and relative income dependence points will be determined for each joint operator *who was a skipper as defined in 20 AAC 05.713(9)* as follows:
>
> (A) Skipper participation points will be determined in accordance with 20 AAC 05.705(a)(1), 20 AAC 05.707(a)(1), and 20 AAC 05.709(a)(1).
>
> (B) [Relative income dependence points]

(Emphasis added.) The catch is divided among the joint operators according to the procedures listed in 20 AAC 05.703(b)(1)-(3), and, as the emphasized passage shows, 20 AAC 05.703(b)(4) requires the joint operator to be a "skipper" to receive skipper participation points. Moreover, 20 AAC 05.703(b)(1) states that the pounds and catch value allocated to each individual will be based on catch records "recorded under each applicant's interim-use permit." Simpson did not have an interim-use permit in 1984.

Applying the reasonable basis standard of review, we therefore uphold CFEC's decision not to grant Simpson skipper participation points for 1984 because we conclude that the decision is neither plainly erroneous nor inconsistent with 20 AAC 05.703(b), .705(a)(1), and .713(9).

**61.** 20 AAC 05.703.

## IV. CONCLUSION

For these reasons, we hold that CFEC did not err in (1) setting the maximum number and the optimum number of permits at seventy-three, and (2) denying Simpson skipper participation points for the 1984 season. We therefore AFFIRM the superior court decision that affirmed CFEC's decision.