Morgan DOUBLEDAY, Appellant
and Cross–Appellee,

v.

STATE of Alaska, COMMERCIAL FISH-
ERIES ENTRY COMMISSION, Ap-
pellee and Cross–Appellant.

Nos. S–13149, S–13189.

Supreme Court of Alaska.

Aug. 20, 2010.

See also 804 F.2d 1091.

Michael Hough, Homer, for Appellant and Cross–Appellee.

Thomas E. Lenhart, Assistant Attorney General and Talis J. Colberg, Attorney General, Juneau, for Appellee and Cross–Appellant.

Before: CARPENETI, Chief Justice, EASTAUGH, FABE, WINFREE, and CHRISTEN, Justices.

## OPINION

CARPENETI, Chief Justice.

### I. INTRODUCTION

A commercial fisher appeals the denial of his application for permits for two fisheries. The Commercial Fisheries Entry Commission denied the permit applications because the fisher produced no evidence of his participation in one fishery and evidence of only minimal participation in the other. On appeal, the fisher argues that he could not meet his burden of proof because the State destroyed or lost the records necessary to prove his case, and that therefore this court should apply the spoliation of evidence doctrine to conclude that the documents would have established his participation. He also argues that the entry commission violated the Limited Entry Act by using the number of vessels to calculate the maximum number of permits in the fisheries. The State cross-appeals, challenging the superior court's award of attorney's fees as too low. Because the fisher fails to establish a claim for spoliation of evidence, we affirm the superior court's decision. We decline to hear the fisher's challenge to the maximum number of permits in these fisheries because he did not exhaust his administrative remedies. Finally, because the superior court did not abuse its discretion, we affirm its award of attorney's fees.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Permitting system

This appeal arises under the Commercial Fisheries Entry Commission (CFEC) point system for allocating permits to fish in two sablefish fisheries, the Southern Southeast Inside (Southern) and the Northern Southeast Inside (Northern) sablefish longline fisheries. The CFEC decided in 1985 that, although these fisheries were not distressed, participation in them should be limited to achieve the purposes of the Limited Entry Act.[1] The CFEC set the maximum number of permits for both sablefish fisheries by determining the number of units of gear during the year of highest participation in the four years prior to limiting entry to the fishery, to comply with our case law requiring that the permit level could not be lower for non-distressed fisheries than it would be under the statutory method of calculating the number of permits for distressed fisheries.[2] That method requires that "the maximum number of entry permits for a distressed fishery . . . shall be the highest number of units of gear fished in that fishery during any one of the four years immediately preceding [limitation]."[3]

The CFEC set the maximum number of permits for the Northern fishery at 73 and the maximum number for the Southern fishery at 18.[4] These numbers reflect the highest number of vessels to fish in these fisheries in the years 1981–1984.[5] These entry permits are distributed according to a point system in which applicants are ranked according to the degree of their past participation in, and economic dependence on, the fishery.[6] In order to be eligible to apply, an applicant must have legally participated in the fishery in at least one qualifying year between 1975 and 1984.[7]

#### 2. Doubleday's established fishery participation and the fish ticket system

Doubleday held interim-use permits for the longline sablefish fishery every year from 1979 through 1984. Under the permitting system at the time, these permits—known as C61B permits—were valid statewide. He licensed two vessels, one of which he used primarily for longlining and specially outfitted in 1980 with longlining gear designed for sablefish. It is not disputed that Doubleday caught 175 pounds of sablefish in 1981 and 1,502 pounds in 1982 in the area now known as the Southern fishery.

When a fisher sells his catch to a processor, the processor is required to generate a record of this sale known as a fish ticket.[8] As the hearing officer explained in denying Doubleday's permit application, fish tickets are "filed and recorded independently of one another each year" by the Department of Fish and Game. Of the copies of fish tickets in the State's files from 1979–1984, the CFEC located 87 for Doubleday. Only two

1. *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1260 (Alaska 1988) (holding that CFEC has authority under Limited Entry Act to adopt regulation establishing maximum number of permits for non-distressed fishery). 20 Alaska Administrative Code (AAC) 05.310(f). The Limited Entry Act is codified at AS 16.43.010–.990 and is designed to promote conservation, sustained yield management of fisheries, and the economic health and stability of commercial fishing. AS 16.43.010.

2. *Simpson v. Commercial Fisheries Entry Comm'n*, 101 P.3d 605, 607 (Alaska 2004) (citing *Johns*, 758 P.2d at 1261–62) (holding that for non-distressed fisheries, maximum number of permits must be no lower than that dictated by statute for distressed fisheries).

3. AS 16.43.240(a).

4. 20 AAC 05.320(e)(1)-(2).

5. *Simpson*, 101 P.3d at 607–08.

6. AS 16.43.250; AS 16.43.270.

7. 20 AAC 05.703(a).

8. *See* 5 AAC 39.130(c): "The first purchaser of raw fish, a catcher-seller, and an individual or company that catches and processes or exports that individual's or company's own catch or has that catch processed or received by another individual or company, shall record each delivery on an ADF & G fish ticket. Fish tickets must be submitted to a local representative of the department within seven days after delivery or final delivery if multiple deliveries are made, or as otherwise specified by the department, for each particular area and fishery."

are for sablefish—both caught in the Southern fishery. No fish tickets in the State's records show Doubleday's participation in the Northern fishery.

## B. Proceedings
### 1. Application, hearing request, and continuances

In 1987 Doubleday applied for permits to both the Northern and Southern fisheries. For the Southern fishery, he claimed on his application that he participated in 1981 and 1982 as both a skipper and holder of a crew member's license. He claimed on his application for the Northern fishery that he participated in that fishery as a crew member from 1979 to 1984 and as a skipper from 1981 to 1984; he later amended this application to claim points for participation as a skipper from 1978 to 1980. Finally, for both the Northern and Southern fisheries, he claimed points for ownership of the fishing vessel EASTERN and relative income dependence.

After requesting additional evidence from Doubleday to support his claims for points in the Southern fishery, the CFEC approved only 16 points for participation in the Southern fishery as a skipper in 1982, and it found no evidence to support his claims for any additional points in either fishery. Because he had not shown that he had ever harvested sablefish from the Northern fishery during the qualifying years (1975–84), the CFEC found him ineligible to even apply for a permit in the Northern fishery. Doubleday requested an evidentiary hearing.

The CFEC granted multiple requests from Doubleday for continuances, first setting the hearing off until 1989[9] and then until 1995.[10] Doubleday represented himself at the 1995 hearing, but it too was continued because Doubleday had no documentary evidence and was not prepared to represent himself. The final portion of the hearing was held on January 24, 1996, and the record was left open until June 2, 1997, at Doubleday's request. After the record was closed in 1997, the hearing officer denied Doubleday's permit applications.

### 2. Missing records

Doubleday claims that evidence that could have allowed him to prove his participation was seized during an investigation of fishing violations that he committed in 1984. Doubleday fished for halibut out of season in Alaska waters and illegally sold the halibut in Seattle.[11] Both federal and state agencies investigated; the State seized certain records, some of which it turned over to federal agencies for the purpose of investigating and prosecuting Doubleday's halibut-related offenses.[12] Doubleday and his attorney in this case made some efforts to locate the seized records, but they were ultimately unsuccessful.[13]

### 3. Evidence at the hearings

At his initial hearing on December 6, 1995, Doubleday appeared telephonically and represented himself. He was not able to testify specifically regarding the years he believed he had participated or the extent of his participation. When asked if he had participated in each of the years 1979 through 1984 in the Northern fishery, he replied:

9. Doubleday obtained one continuance on the grounds that he could not communicate with key witnesses, such as crew members who could verify his fishing history, because his conditions of probation from a prior federal fishing violation prohibited him from communicating with these crew members until his probation ended.

10. The day before that hearing date, Doubleday's attorney requested another continuance. Shortly thereafter he informed the hearing officer that "virtually all of Doubleday's fishing records" were unavailable as evidence for the hearing, because "federal and state authorities" had seized the records as part of a prosecution for "some fishing violations" in 1984–85.

11. *See United States v. Doubleday,* 804 F.2d 1091, 1093 (9th Cir.1986).

12. *Id.*

13. At one point, a Freedom of Information Act request to the Executive Office for United States Attorneys—the official record-keeper for "all records located in ... the various United States Attorney's offices"—was denied with the notation that "[the documents] are public records which may be obtained from the Clerk of the Court or from this office, upon specific request, subject to copying fees." The denial letter contained appeal instructions; there is no indication that an appeal was ever taken.

It's been—been some time, and off the top of my head I—I can't be absolutely sure that's—that's absolutely correct. Although I do know that I—that I fished there—you know, at points during the—at that time period.

The hearing officer followed up by asking him to confirm his recollection of his participation in the Southern fishery, for which he claimed additional points for 1981, 1983, and 1984. He answered, "I—I believe that's correct, yeah." Doubleday said he had owned a number of vessels, but said his longlining boats were the KETCHUM II—a smaller vessel he owned through 1982 and converted from a trolling vessel to a longlining vessel—and the EASTERN—a larger vessel he gradually transferred over to as his main vessel from 1979 to 1982 and continued to use. He believed, though he could not specifically recall, that he had used the KETCHUM II in the inside sablefish fisheries. He stated that he used the EASTERN primarily for longlining for both halibut and sablefish. He always sold the sablefish to commercial buyers, mainly in Alaska but perhaps also in Prince Rupert, British Columbia. He testified that he longlined and trolled in the early 1980's and ended his trolling efforts altogether "towards '85."

After taking some testimony and learning that Doubleday had no witnesses or documentary evidence of participation in either fishery through 1984, the hearing officer stopped the hearing. He told Doubleday he would obtain a printout of all known fish tickets and recommended that Doubleday look into specific additional sources of evidence of his participation, and continued the hearing until January 24, 1996.

At the January 1996 hearing, Doubleday represented himself, but mentioned that his attorney had recommenced his efforts to locate the seized records. He did not ask for a continuance and the hearing proceeded, but the record was left open for an additional year and a half in case Doubleday or his attorney located further information. Also at the January 1996 hearing, the hearing officer reviewed each year for each fishery, noting the catches for which the department had records for salmon and halibut. For each year, Doubleday sold halibut or salmon during the sablefish season, and the hearing officer asked if it was conceivable that he would have been fishing both sablefish and salmon during those seasons and whether he would have sold the sablefish at the same time he sold the other fish. Doubleday indicated that he had done a lot of combination fishing in those days and said it was conceivable. He testified that he did not believe he had missed any sablefish season in the Northern fishery back through 1978. When asked if he had an explanation for why the Department of Fish and Game had no fish tickets, he stated that he knew that the department had lost some records and he hypothesized that some of his sablefish tickets could be among them. The hearing officer asked him about a loan application for the purchase of a larger boat in 1979, on which he was asked to list his fishing history, and on which he listed halibut and salmon but not sablefish. Doubleday responded that sablefish prices were depressed at the time he filled out the loan application and his crew was "putting in the effort" but not making money from that fish. Doubleday could not remember specifics about any individual season other than the years in which he had gotten credit for landing sablefish in the Southern fishery, 1981 and 1982.

Doubleday submitted affidavits from several persons, all identical, stating:

> This note will serve as an affidavit that I, [affiant], have knowledge of Morgan Doubleday fishing the vessel Eastern 228794 during the years 1980–1990 and during this time he primarily fished black cod and halibut longline conventional gear.

> The Eastern was involved in statewide as well as Clarence Straits and Chatham Straits fishing during this 10 year period. I can recall Morgan Doubleday and the Eastern fishing grounds with us and can remember him making deliveries to various plants with his product of longline caught black cod.

Doubleday never submitted any other testimony or evidence from other crew members or companies that might have purchased sablefish. No additional records or evidence

were submitted before the record was closed on June 2, 1997.

#### 4. Denial of appeals

Hearing Officer Frank Glass issued his companion decisions for the two fisheries on December 10, 1997, finding that Doubleday failed to meet his burden of proof that he qualified for additional points in either fishery. He therefore denied Doubleday's applications for both. On July 6, 2006, the CFEC issued its final decisions. It confirmed that Doubleday was eligible for only 16 points in the Southern fishery and that his application would "remain pending until the commission can determine mathematically whether applicants with 16 points can be issued a permanent entry permit." The commission also confirmed that Doubleday had proven no participation in the Northern fishery and was therefore ineligible to apply for a permit in that fishery. The commission affirmed these decisions on reconsideration in August 2006.

In the superior court, Doubleday argued that the CFEC erred in setting the maximum number of permits for both fisheries and that the decision was not supported by substantial evidence. He also argued that the State violated his procedural due process rights by closing the record and that the court should apply the doctrine of spoliation of evidence and shift the burden of proof to the State because it had lost records seized from him relating to his fishing activities in the disputed years. Superior Court Judge Anna M. Moran held that Doubleday failed to meet his burden of proof and, even if the doctrine of spoliation of evidence could apply to this type of case, no evidence supported his claims that the government negligently or intentionally destroyed records or that any documents existed which could establish his participation in either fishery. Judge Moran declined to reach the issue of whether CFEC erred in setting the maximum number of permits, stating that "[b]ecause the court has found in favor of CFEC on these issues, it is unnecessary for the court to rule [on the claim of error in setting the maximum number]."

### III. STANDARD OF REVIEW

When the superior court acts as an intermediate court of appeal for an administrative decision, we directly and independently review the administrative decision.[14] "We have recognized four principal standards of review for administrative decisions: (1) the substantial evidence standard applies to questions of fact; (2) the reasonable basis standard applies to questions of law involving agency expertise; (3) the substitution of judgment standard applies to questions of law where no expertise is involved; and (4) the reasonable and not arbitrary standard applies to review of administrative regulations." [15] We therefore review the agency's factual determinations regarding Doubleday's spoliation of evidence claim under the substantial evidence standard, and its legal determinations under the substitution of judgment standard.

### IV. DISCUSSION

#### A. It Was Not Error To Reject Doubleday's Claim Of Spoliation Of Evidence.

Doubleday argues that any failure to meet his burden of proof regarding the participation requirement is the result of the State's "spoliation" of his "fishing ... logs, ... fish tickets, and all other evidence of participation in this fishery." He argues that he made a "good faith effort" to overcome the "mishandling of virtually all of his historical fishing records ... [and] spoliation of his evidence of fishing in the subject fishery." He finally argues that the supplemental evidence which the CFEC obtained from public state court records in fact shows that the State "destroyed, lost, or misplaced" records that he "believes necessary to prove his entitlement to the permit."

The CFEC argues that for the State to have lost all six years of fish tickets in its files showing Doubleday's participation in the Northern fishery and four years of his participation in the Southern fishery defies proba-

---

**14.** *Conkey v. State, Dep't of Admin., Div. of Motor Vehicles,* 113 P.3d 1235, 1237 (Alaska 2005).

**15.** *Pasternak v. State, Commercial Fisheries Entry Comm'n,* 166 P.3d 904, 907 (Alaska 2007).

bility. Further, Doubleday failed to produce any evidence of his participation in these fisheries other than his vague testimony and some over-broad affidavits. The CFEC concluded that the more likely explanation for the lack of fish tickets is that Doubleday did not fish in either the Northern or Southern fishery during the relevant period of time. The CFEC further argues that any claim that the State lost or destroyed records in Doubleday's possession that proved his sablefish participation is contradicted by the list of items seized in the search warrants it obtained from state court relating to the 1984 investigation.[16]

■■ In order to obtain the benefit of the spoliation of evidence doctrine, Doubleday must first establish that the absence of records hinders his ability to establish a prima facie case.[17] He must also produce some evidence that the records are missing through the intentional or negligent act of the adverse party.[18] If he could establish fault on the part of the State for the destruction of evidence necessary to his case, then a court could apply a rebuttable presumption that the missing documents would have established facts unfavorable to the CFEC.[19] The hearing officer found that Doubleday did not produce evidence supporting his claim that records had been destroyed or wrongfully kept from him, and also failed to demonstrate what potential evidence might exist and how it might affect the outcome.

■ We agree with the CFEC that Doubleday must make some showing that the records were lost due to fault of the State and that they would likely support his claim. Here, the only evidence offered on either issue is that the State seized 54 pages of documents from a seafood processor relating to the 1984 halibut season and that Doubleday's home was searched, but that nothing was seized. The search warrants do not provide any indication that the State seized any sablefish-related records. Rather, the search warrant served on the seafood processor was limited to documents reflecting Doubleday's purchase of supplies and his sale of halibut. The warrant's receipt and inventory confirm that only such documents were seized. No property was seized when officers searched Doubleday's home pursuant to the warrant. Finally, any navigational charts obtained during the investigation were turned over to the federal government "as part of an ongoing investigation and are no longer under the control of state prosecuting authorities," as found by the federal district court.[20] Doubleday has not established any evidence that the State was negligent in its actions regarding these records, or that they are likely to contain anything of relevance.

The CFEC gave Doubleday from 1987 until 1997 to locate any material evidence in the hands of the federal government. The CFEC suggested use of subpoenas, provided current addresses for former crew members who might be able to provide specific recollections of participation, and suggested other means of obtaining evidence that Doubleday participated in the fisheries. The Freedom of Information Act office responded to Doubleday's request for his federal records as follows in 1997: "[The documents] are public records which may be obtained from the Clerk of the Court or from this office, upon specific request, subject to copying fees." Doubleday does not indicate, and the record does not suggest, that he ever challenged this response or followed up on it. Nor does he indicate whether he ever searched any additional state or federal court records. His efforts were incomplete at best, and he never accepted the CFEC's offer for assistance or subpoenas.

Accordingly, we affirm the superior court's conclusions that Doubleday failed to show that there was negligence in the loss of the

---

16. Neither party has addressed the issue whether sanctions for spoliation of evidence are available in an administrative proceeding. We assume, without deciding, that this is the case.

17. *Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 491 (Alaska 1995).

18. *Id.*

19. *Id.* at 491–92.

20. Doubleday also alleges seizure of a Christmas gift order form and a calendar, but does not explain how these items could demonstrate participation in the subject fisheries.

records and failed to show that the records would change the determination of Doubleday's participation in the Northern and Southern fisheries. We also affirm the superior court's conclusion that the CFEC's findings on this issue are supported by substantial evidence.

### B. Doubleday May Not Challenge The CFEC Determination Of The Maximum Number Of Permits In Either The Southern Or Northern Fishery.

Doubleday argues that the CFEC erred in determining the maximum number of permits for both the Southern and Northern fisheries. He argues that the CFEC's use of the number of vessels as equivalent to the number of units of gear in setting the maximum for both fisheries is obviously incorrect. The CFEC makes three arguments in response: first, that Doubleday may not raise this challenge because he failed to exhaust his remedies below; second, that he lacks standing to challenge the procedure regarding the Northern fishery; and third, that the procedures have already been approved by this court, so further challenge is foreclosed.

■ We begin by determining whether to apply the doctrine of exhaustion of remedies to this issue. In applying the doctrine of exhaustion of remedies, we must decide the following: (1) is exhaustion of remedies required; (2) did the complainant exhaust those remedies; and (3) if not, is the failure to exhaust remedies excused? [21]

### 1. Doubleday was required to exhaust his administrative remedies before the agency prior to raising this challenge.

The CFEC argues that Doubleday may not raise a challenge to its method of setting permits because he did not raise this claim before the agency, and therefore has not exhausted his remedies with regard to this claim. Doubleday argues that exhaustion should not be required because it is "obvious" that CFEC's use of the number of vessels as equivalent to the number of units of gear violates the Limited Entry Act.

■ A claimant must generally exhaust administrative remedies before making a claim in court challenging the agency's decision-making procedures. We have observed that "[t]he basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." [22] On the other hand, certain "pure issues of law," most notably constitutional issues but also certain questions of statutory validity, are "within the special expertise" of the court, rather than the administrative agency.[23] However, our cases make clear that only the purest legal questions, requiring no factual context, are exempt from the exhaustion requirement:

> If "a procedural challenge to agency decisionmaking has simply been dressed in constitutional clothing," or if the action is "an attempt to substitute a damage claim in tort for an unperfected administrative remedy," the complainant must first exhaust administrative remedies. On the other hand, if the claim does not challenge any particular decision by an agency and instead calls upon the superior court to review only the validity of a statute, exhaustion of administrative remedies is not required.[24]

**21.** *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98–99 (Alaska 1992). Ordinarily, the trial court makes this decision in the first instance and we review for abuse of discretion. *Id.* at 98. Here, the trial court did not explain its decision not to reach this claim, apparently believing it was unnecessary because it upheld the CFEC's findings regarding the spoliation of evidence claim. However, we believe that the issue must be addressed because Doubleday could conceivably qualify for the Southern fishery with 16 points if the number of permits allowed were to increase.

**22.** *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119, 121–22 (Alaska 1988).

**23.** *Moore v. State, Dep't of Transp. & Pub. Facilities*, 875 P.2d 765, 767 (Alaska 1994); *see also Standard Alaska Prod. Co. v. State, Dep't of Revenue*, 773 P.2d 201, 207 (Alaska 1989) ("[W]here a controversy involves *only* constitutional [issues], and no factual issues, the exhaustion doctrine may be held not to apply.").

**24.** *State, Dep't of Transp. & Pub. Facilities v. Fairbanks N. Star Borough*, 936 P.2d 1259, 1261 (Alaska 1997) (internal citations omitted).

We have suggested that accusations that an agency has violated a statute are generally subject to the requirement of exhaustion.[25]

Under the Limited Entry Act, the CFEC must base the maximum number of permits on the maximum number of "units of gear fished in that fishery during any one of the four years immediately preceding [limitation]."[26] The CFEC freely admits that it considers vessels equivalent to "units of gear" and claims that they are equivalent for this type of fishery. Although Doubleday states that this is "obviously" in violation of the Limited Entry Act, he does not explain how or why another definition would be more appropriate to this fishery. Neither party addresses the definition of "unit of gear" in the Limited Entry Act or its application to sablefish longline fisheries.

The term "unit of gear" is defined by statute for limited entry fisheries. Alaska Statute 16.43.990(11) states that a "unit of gear" means "the maximum amount of a specific type of gear that can be fished by a person under regulations established by the Board of Fisheries defining the legal requirements for that type of gear." By its terms, the implementation of this statutory definition requires application of expertise about the fishing industry.

Definitions for "unit of gear" for some distressed fisheries—using types of gear other than longlines—have been provided by regulation: " 'unit of gear' means the aggregate amount of gear operated from a single vessel."[27] We have previously noted the commission's use of the number of vessels to set the maximum number of units of gear in the Northern fishery, without explicitly ruling on whether the number of "unit[s] of gear" is equivalent to number of vessels.[28] No definition for "unit of gear" is provided for the sablefish fisheries in the definition section of the regulations, no definition of "unit of gear" is specific to the Northern and Southern fisheries,[29] and neither side has pointed to any additional regulations providing further details on the appropriate procedures for setting the maximum number of units of gear in the sablefish longlining context.

■ We cannot agree with Doubleday's assertion that the CFEC has committed obvious error in using a vessel count to calculate the maximum "unit of gear." In the absence of regulatory clarification of the definition of units of gear, no basis exists for evaluating the allegation that the CFEC has improperly found "units of gear" to be equivalent to number of vessels. Doubleday apparently believes the maximum number of units of gear should be the same as the number of permit-holders fishing, but does not explain why that more clearly equates with the statutory definition. It is unclear from the record how many longlines or operators are on a typical sablefish vessel or how one would go about determining the maximum number of longlines that could be operated by one person in accordance with the legislature's directive in AS 16.43.990(11). In summary, this term cannot be defined without factual context and expertise regarding the fishing industry.

This question clearly falls within the agency's expertise. For that reason, we apply our rule that "it is axiomatic to our system of

**25.** *See Moore*, 875 P.2d at 767–68 (holding that Moore's action for declaratory relief was not subject to the exhaustion requirement and distinguishing it from cases in which claimant argued there had been a violation of applicable statutes).

**26.** AS 16.43.240(b), applied to non-distressed fisheries in *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1261–62 (Alaska 1988); *see also Simpson v. Commercial Fisheries Entry Comm'n*, 101 P.3d 605, 607 (Alaska 2004).

**27.** *See, e.g.*, 20 AAC 05.686 ("In 20 AAC 05.680–20 AAC 05.686, unless otherwise specified . . ., 'unit of gear' means the aggregate amount of gear operated from a single vessel.").

**28.** *Simpson*, 101 P.3d at 607–08 ("CFEC therefore proposed limiting the number of vessels in the fishery to 73, the number of vessels fishing in 1984, the season in which participation was highest."). *See also Pasternak v. State, Commercial Fisheries Entry Comm'n*, 166 P.3d 904, 908 n. 34 (Alaska 2007) (noting that *Simpson* does not foreclose litigant's argument that correct number to measure units of gear was number of participants rather than number of vessels, but nonetheless declining to rule on argument because Pasternak had not shown prejudice).

**29.** 20 AAC 05.713 (2008).

justice that we have a factual context within which to review a case."[30] This agency decision has been made in a factual context we are ill-equipped to understand without a record developed at the agency level. We therefore conclude that Doubleday was required to exhaust this claim within the agency appeal process.[31]

### 2. Doubleday did not exhaust available administrative remedies.

Doubleday did not raise any arguments regarding error in setting the maximum number of permits before the hearing officer or on appeal to the CFEC. Therefore, there is no dispute that this element is met.

### 3. Doubleday's failure to exhaust is not excused for futility.

■ Doubleday finally argues that his failure to exhaust his administrative remedies should be excused on futility grounds. He claims that the hearing officer "did not have authority to consider Mr. Doubleday's claims regarding the maximum number of permits CFEC was required to issue." He also appears to argue that the CFEC has rejected "essentially the same arguments and facts in several cases," and therefore raising the argument again would be futile.

While Doubleday is correct to the extent that he claims that a hearing officer may not set aside a regulation on his own authority,[32]

Doubleday overlooks that the CFEC reviews all hearing officer decisions on appeal. Had he raised his challenge before the agency, the agency would have had the opportunity to explain its use of expertise and the facts on which it relied in developing its counting methodology. In fact, we recently remanded a case for consideration of this same type of issue to the CFEC in *May v. State, Commercial Fisheries Entry Commission*;[33] in that case, we noted that the CFEC had already amended its regulation in one respect in response to May's petition for review.[34] It is not futile to raise these issues before the CFEC, because the CFEC has the power to amend its own regulations. Indeed, the CFEC must have the opportunity to consider these arguments in the first instance for the exact reasons that justify the exhaustion of remedies: to develop a factual record, apply its expertise, and provide a context for our review.

Doubleday also argues that the exhaustion requirement should be excused under a futility exception because the CFEC rejected a similar argument in a recent case.[35] That case, decided considerably after Doubleday's appeal before the CFEC, does not excuse Doubleday from the requirement that he exhaust his remedies. It would not have been futile for Doubleday to raise arguments and introduce factual evidence of data relating to the meaning of "units of gear" before the

**30.** *Ben Lomond, Inc. v. Municipality of Anchorage,* 761 P.2d 119, 122 (Alaska 1988).

**31.** It is unclear whether Doubleday raises a separate challenge to the methodology of counting vessels. He argues that "[t]he maximum number [of units of gear] should be ... 74 to 86." The State responds, and we agree, that this argument is based on a misreading of Alaska Department of Fish and Game data. The department's chart does state that the "number of permits" in the Northern fishery was 86 in 1984, but notes that "[p]rior to 1985 there was not a [Northern fishery] sablefish permit card so the number of permits includes sablefish landings made on mixed gear and permit cards" covering halibut, mixed fin fish, and salmon, as well as sablefish. Doubleday also makes an assertion at one point that CFEC used an incorrect number in the past for the Southern fishery, but he later concedes that this was corrected by the CFEC, as recognized in *May v. State, Commercial Fisheries Entry Comm'n,* 175 P.3d 1211, 1213 n. 5 (Alaska 2007),

and that the number of vessels was in fact 18. To the extent that Doubleday is attempting to claim that the methodology of counting the vessels was incorrect in some other way, the same rationale applies as to his claim that the CFEC improperly used vessels as equivalent to units of gear: This claim should have been raised before the agency in order to develop a factual record.

**32.** *Kalmakoff v. Commercial Fisheries Entry Comm'n,* 693 P.2d 844, 846 n. 3 (Alaska 1985) ("Appellant could not [challenge CFEC regulations] at the administrative hearing because a hearing officer has no power to set aside a challenged regulation.").

**33.** 175 P.3d at 1213.

**34.** *Id.* at 1213 n. 5.

**35.** Vincent P. Arbucci, CFEC 89–331–A, at 12–16, 23 (December 16, 2008) (final admin. review).

CFEC. Before us, Doubleday makes several unsupported factual claims regarding what data held by Department of Fish and Game and "other commercial fisheries regulating agencies" would show on the issue of whether units of gear and vessels are the same. Had he raised these issues before the CFEC, it would have been able to develop these facts and apply its expertise to the interpretation of this information. At this point, we have no basis to evaluate these alleged facts, the details of which are nowhere in the record. We see no obvious violation of the Limited Entry Act and remain unable to evaluate the agency's application of its expertise within the factual context of this case.[36] The fact that neither side has introduced evidence regarding the appropriate definition of "unit of gear" under the statute is a result of Doubleday's failure to exhaust his remedies before the CFEC.

Because it would not have been futile for Doubleday to raise his claims before the CFEC, and because his failure to do so results in a complete lack of a factual record for us to evaluate the CFEC's implementation of AS 16.43.990(11)'s "unit of gear" definition, we conclude that Doubleday may not now challenge the agency's use of vessel count to calculate the maximum number of permits in both the Northern and Southern fisheries.

### C. The Superior Court Did Not Abuse Its Discretion In Finding That The Doubleday Appeals Were Neither Frivolous Nor Brought For Purposes Of Delay.

The CFEC cross-appeals, arguing that the superior court abused its discretion in finding that Doubleday's appeals were neither frivolous nor brought for purposes of delay. The

CFEC claims that because Doubleday's "entire argument" rested on the State having specifically seized five boxes of records and the court found it not to have been shown that the records were seized or even existed, the court should have found the appeal to have been frivolous or brought for purposes of delay. Not only did the records not exist, the CFEC claims, but Doubleday was aware of their non-existence. The CFEC claims that Doubleday has knowingly continued to fish for 20 years on an interim permit in the Northern fishery that he knew he was not entitled to.

Doubleday contends that he made his arguments regarding the maximum number of permits in good faith and not for purposes of delay. He argues that he had a reasonable basis to believe other records existed that could help him because the federal prosecutor suggested more records existed, because CFEC's paralegal told him that a state trooper had 107 pages of records, and because his belief that his charts and delivery records still existed was confirmed by the State.

■ A superior court sitting as an intermediate court of appeal has broad discretion to award attorney's fees.[37] The superior court found that Doubleday did not bring his appeal simply for purposes of delay and that it was not frivolous. Generally, we find an abuse of discretion in the award of attorney's fees if the award is "arbitrary, capricious, manifestly unreasonable, or improperly motivated."[38] We see no abuse of discretion in the superior court's conclusion that the appeal was neither frivolous nor brought for purposes of delay.

## V. CONCLUSION

Because Doubleday presented insufficient evidence upon which the CFEC could find

---

**36.** The argument that the CFEC has incorrectly interpreted the statutory definition of "units of gear" by equating it with vessels for all gear is not foreclosed by either *Pasternak v. State, Commercial Fisheries Entry Comm'n,* 166 P.3d 904 (Alaska 2007), in which we declined to reach the argument on grounds that the claimant could not show prejudice, *id.* at 908, or by *Simpson v. State, Commercial Fisheries Entry Comm'n,* 101 P.3d 605 (Alaska 2004), in which we found the argument waived for failure to raise it before the superior court. *Id.* at 611. We have never con-

clusively decided this issue or had an adequate factual context to approve CFEC's application of the statutory definition of "units of gear."

**37.** Alaska R.App. P. 508(e); *see Cleaver v. State, Commercial Fisheries Entry Comm'n,* 48 P.3d 464, 470 (Alaska 2002).

**38.** *Rhodes v. Erion,* 189 P.3d 1051, 1053 (Alaska 2008) (quoting *Kellis v. Crites,* 20 P.3d 1112, 1113 (Alaska 2001)).

that the State was at fault in the destruction of records that might have established that he was entitled to more participation points, we AFFIRM the CFEC's denial of additional points. Because Doubleday failed to raise his challenge to the maximum number of permits before the CFEC and we have no factual context in which to evaluate the agency's application of its expertise to the definition of "units of gear" in the sablefish long-lining context, we decline to consider this challenge. Finally, because we see no abuse of discretion in the superior court's award of attorney's fees, we AFFIRM that award. Accordingly, we AFFIRM, in all respects, the decision of the superior court that affirmed the decision of the CFEC.